**NEW ENGLAND HEALTH CARE, EMPLOYEES UNION, DISTRICT 1199, SEIU/AFL—CIO, Plaintiff,**

v.

**Honorable John G. ROWLAND, Governor of State of Connecticut, individually and in his official capacity, et al., Defendants.**

**No. Civ.A. 3–01–CV–464 J.**

United States District Court, D. Connecticut.

Sept. 13, 2002.

John M. Creane, Michael E. Pssero, Law Offices of John M. Creane, Milford, CT, for Plaintiff.

Gary S. Starr, Sheila Huddleston, Brian Clemow, Gabriel Joseph Jiran, Shipman & Goodwin, Hartford, CT, James K. Robertson, Jr., Carmody & Torrance, Waterbury, CT, for Defendants.

## TRIAL DECISION

HALL, District Judge.

In this action, the plaintiff, New England Health Care Employees Union, District 1199, SEIU/AFL—CIO ("District 1199"), seeks declaratory judgment and damages allegedly arising from the conduct of the defendants, the Honorable John G. Rowland ("Governor Rowland"), individually and in his official capacity as Governor of the State of Connecticut ("the State"), and Patricia Wilson–Coker, in her official capacity as Commissioner of the Department of Social Services, (collectively "defendants"), in connection with strikes by members of District 1199. District 1199 alleges that the defendants' use of state power in connection with an ongoing labor dispute between itself and Connecticut nursing homes in 2001 interfered with its members' rights protected by the National Labor Relations Act ("NLRA"). District 1199 further alleges that Governor Rowland violated its members' First Amendment rights. The action is brought pursuant to 42 U.S.C. § 1983.

The focus of District 1199's complaint is the State's payment of anticipatory subsidies to nursing homes for strike-related expenses under the umbrella of the Medicaid program. The State acknowledges that it funded nursing homes, according to the Medicaid portion of its strike-related expenses and before any cash outlay by the nursing home, but contends that its actions fell within its discretion to administer the State Medicaid program in order to safeguard the health and safety of nursing-home residents. The essence of the dispute is whether the Medicaid subsidies conflict with the rights of District 1199's members under the NLRA; the scope of the State's discretion, if any, to administer its Medicaid program; and whether the State acted within its discretion by providing anticipatory Medicaid subsidies to nursing homes.

Although in opposition in this case, the parties before the court stand unified in the often uncelebrated task of caring for frail, elderly members of our society. The State struggles to satisfy its legal and moral obligations to indigent nursing-home residents, while, every day, members of District 1199 work tirelessly to fulfill their exhausting and difficult duties. Accordingly, although this case focuses primarily on the legal complexities of NLRA preemption, the court in its decision does not mean to overlook the laudable efforts of all parties when those efforts are undertaken in service of the people of the State of Connecticut.

## I. FINDINGS OF FACT[1]

The State has currently licensed approximately 250 nursing homes, with 30,000 licensed nursing-home beds. District 1199 represents approximately 7000 union members who are employed at seventy-one nursing homes in Connecticut. Some members are employed as registered nurses, licensed practical nurses, nurses' aides, or housekeepers. Other members work in maintenance, laundry, clerical, or other positions.

---

1. Because of the complex interplay of fact and law in this case, some arguably factual findings are recited in the conclusions of law where those findings involve a mixed question of law and fact. Similarly, some arguably legal conclusions are recited in the findings of fact where those conclusions are part of the factual context for the parties' actions.

Since 1999, the State has had a shortage of available nursing personnel, at all levels of certification and training, to work in nursing homes on a permanent or temporary basis. A job action involving several thousand replacement workers is beyond the capacity of the local private agencies, which number approximately two dozen and individually could only handle a demand in the range of 20–100 replacement personnel. The availability of staff from local agencies, during a strike, would be reduced further because local workers are often unwilling to cross picket lines.

During March and May 2001, District 1199 engaged in two job actions at forty nursing homes. Approximately seventy-six percent of the residents in the nursing homes affected by the strikes at issue in this case are covered by the federal Medicaid program.[2] The percentage of residents receiving Medicaid at those nursing homes ranged from fifty-six to ninety-four percent at the time of the strikes in question. During the 2001 labor dispute, the State provided anticipatory subsidies, proportionate to a nursing home's Medicaid population, for the employer's strike-related expenses.

A. Regulatory Background and Past Practice

Nursing homes have the primary legal obligation to provide for the health and safety of their residents. Connecticut nursing homes are regulated by the State under the auspices of the Department of Public Health ("DPH"). DPH establishes and monitors the level of care and staffing required to maintain the safety, health, and welfare of nursing-home residents. DPH is responsible, under state statute, for assessing the care and services provided to nursing-home residents to determine whether nursing homes properly care for their residents' health, safety, and welfare.[3]

DPH inspects nursing homes to assess compliance with federal and state Medicaid and Medicare mandates on patient care and issues reports on those inspections. In addition, DPH determines whether a nursing home complies with laws and regulations for state licensure and federal certification. When nursing homes are not in compliance, DPH may issue letters ordering the nursing home to take immediate steps to remedy the non-compliance. DPH can also issue fines for noncompliance and can take steps to revoke or limit an operator's nursing-home license. If DPH determines that a nursing home has financial difficulties that affect its ability to care for its residents, the agency communicates that concern to the Department of Social Services ("DSS"), which handles fiscal issues related to nursing homes.

The State, through DSS, reimburses nursing homes for the cost of the food, shelter, and medical care of residents covered by Medicaid.[4] The federal government reimburses the State for fifty percent of its allowable Medicaid costs. Approximately ten percent of the State's budget is spent on Medicaid for nursing homes.

DSS reimburses each Connecticut nursing home for care provided to Medicaid-eligible residents in accordance with the facility's "base rate." Each facility's "base rate" is determined by DSS periodically under a methodology that utilizes the historical costs of providing care at that particular nursing home. DSS establishes a facility's historical costs according to annual reports provided by the facility, which

2. See 42 U.S.C. §§ 1396–1396v.

3. Conn.Gen.Stat. §§ 19a–493, 19a–496.

4. DSS has approximately 2300 employees, including 40–50 employees with financial classifications, such as analyst, accountant, and auditor.

reports itemize all expenditures for the fiscal year ending on September 30.[5] State law provides for calculation of each facility's base reimbursement rate once every two to four years.[6] State law caps spending in many areas, which caps affect the provision in the law that allows reimbursement for reasonable costs mandated by collective bargaining agreements.[7]

DSS has had to advance monies from future Medicaid per diem payments to nursing homes having cash flow problems and without the resources to pay their bills, including payroll. These payments are based on the need to ensure that the care of residents is maintained at the levels required by both the federal and state governments. DSS has made such advance reimbursements under the "good cause" provision of the State's Medicaid Plan and Connecticut General Statutes § 17b–340.[8][9]

Before the 2001 job actions, nursing homes preparing for a strike had made alternative preparations for the care of residents: obtaining volunteers, hiring temporary replacement workers, or requiring supervisors to provide resident care. In some instances, nursing homes moved residents, stopped admitting new residents, or otherwise curtailed operations. During previous nursing-home strikes, the State has sent inspectors or monitors to the nursing homes to ensure that nursing-home operators continued to provide residents with adequate care during the strike. In addition, if a strike jeopardized the health and safety of nursing-home residents, the State, through the DPH Commissioner, could seek the appointment of a receiver, stop admissions, move nursing-home residents, or limit the license of a nursing home.[10]

To ensure the safety of nursing-home residents during a strike, Connecticut law requires that nursing homes submit strike contingency plans to DPH.[11] The contin-

---

5. Conn.Gen.Stat. § 17b–340(a).

6. *Id.* § 17b–340(f)(8).

7. *Id.* § 17b–340(a).

8. In relevant part, the State Medicaid Plan reads: "Where good cause appears the commissioner may permit deviation from these rules, except where precluded by statute." Def.Exh. 308, § 17–311–13. In relevant part, the statute reads: "The commissioner may, in his discretion, allow the inclusion of extraordinary and unanticipated costs of providing services which were incurred to avoid an immediate negative impact on the health and safety of patients." Conn.Gen.Stat. § 17b–340.

9. In this opinion, the court distinguishes four methods used by DSS to pay nursing homes for Medicaid expenses. First, as discussed above, DSS has reimbursed nursing homes according to the normal per diem rates, as established according to the State Medicaid Plan and approved by the Health Care Financing Administration. The court refers to these payments as the nursing home's "daily rate." Second, as discussed above, DSS has reimbursed nursing homes above the daily rate by advancing monies from future daily-rate payments, which monies DSS recovered by offsets of later daily-rate payments. The court refers to these payments as "advance reimbursements." Under the third method to be discussed *infra*, DSS has reimbursed nursing homes outside the daily rate for extraordinary and unanticipated costs, according to Connecticut General Statutes § 17b–340(a). The court refers to these payments as "extraordinary cost reimbursements." Under the fourth method to be discussed *infra*, DSS has funded nursing homes outside the daily rate for estimated extraordinary and unanticipated costs before those costs were incurred. The court refers to these payments as "anticipatory subsidies." Unlike advance reimbursements, DSS never recoups funds properly paid as extraordinary-cost reimbursements or anticipatory subsidies.

10. Conn.Gen.Stat. §§ 19a–485 to –560.

11. Conn.Gen.Stat. § 19a–497.

gency plans include: the name and contact information for key personnel at the nursing home, including a liaison to the State for the duration of the strike; telephone numbers and other contact information for local emergency services, utility providers, and suppliers for medical services and supplies; descriptions of current residents, including census and diagnoses; details regarding staffing patterns expected during the strike and sources for replacement workers; security and transportation plans for residents, staff, and supplies; and other information necessary to ensure uninterrupted services. DPH does not require that nursing homes provide any financial data or sources of funding as part of the contingency plan. DPH has not shared the contingency plans with other agencies, but it has provided other agencies with summaries of the information in the nursing homes' plans.

DPH reviews the contingency plans to ensure compliance with minimum staffing requirements and other state and federal regulations. Also, DPH verifies the availability of sufficient staffing at listed sources for replacement workers. Although DPH does not interfere with a nursing home's choice of provider for replacement workers, the agency coordinates providers in the event of multiple struck facilities in order to ensure available staffing for all affected nursing homes. Absent problems with implementation of a nursing home's contingency plan, DPH considers the health and safety of the residents adequately protected once it verifies and approves the contingency plan. To ensure effective implementation, DPH monitors nursing homes on a daily basis during strikes.

B. First Use of Extraordinary–Cost Reimbursements: The 1999 Strike Notices

In anticipation of strikes by District 1199 in early 1999, the Office of Policy and Management ("OPM") convened a meeting, in the fall of 1998, of various state agencies to establish an inter-agency contingency plan. Agencies, such as DPH, DSS, the Office of Emergency Management ("OEM"),[12] the Department of Mental Retardation, the State Police, and the Department of Transportation ("DOT"), developed plans describing what actions they would take in the event of a strike. As a result of the inter-agency planning, a report was prepared outlining each agency's responsibilities. The plan included specific steps that would be taken in order to ensure that the care of nursing-home and group-home residents during any strike satisfied applicable law and regulations.

In February 1999, during the last significant round of new contract negotiations between the nursing homes and District 1199, District 1199 sent out ten-day strike notices to forty-seven nursing homes. Just prior to the reported strike date, the Governor announced that he was proposing an approximately $200 million increase in funds for wages and benefits in the nursing-home industry. While the Governor's announcement averted strikes at most nursing homes, District 1199 did

12. If municipalities cannot adequately respond to a situation, OEM is responsible for planning, implementing, and managing the State's response to actual or potential natural disasters; public emergencies; and threats to the health, safety, and welfare of the citizens of Connecticut or to their property. OEM also coordinates the State's response to situations that directly affect state services. OEM maintains a central command center so that the State can coordinate its response to emergencies. Among the statewide emergencies to which OEM has responded are the Y2K problem, large snow storms, hurricanes, and other potential disasters that may impact state residents.

strike some nursing homes where contracts could not be negotiated.

Before the Governor's announcement, the State had not addressed whether extraordinary-cost reimbursements for strike-related expenses, including contract retainers for replacement workers, were necessary to ensure the health and safety of residents of the targeted homes. However, while the 1999 strike was pending, DPH, in verifying sources for replacement workers, identified a shortage of available staff at the nursing pools listed in the nursing-home contingency plans. After the Governor's announcement and in discussions with Michael Starkowski ("Starkowski"), Deputy Commissioner of DSS,[13] concerning the financial condition of some nursing homes and their need for reimbursement of expenses related to resident care, Mark Ryan ("Ryan"), the Secretary of OPM, determined that the State had the financial resources to reimburse nursing homes for the Medicaid portion of strike-related expenses. Ryan and Starkowski believed that the reimbursements were necessary in light of the staffing shortages at nursing pools. They concluded that the shortages increased the costs for replacement workers, by either driving up the cost of local nursing pools or by forcing nursing homes to use expensive out-of-state contractors.

In providing extraordinary-cost reimbursements for strike-related expenses, the State relied on the language in Conn. Gen.Stat. § 17b–340 for payment of "extraordinary and unanticipated costs." Prior to 1999, DSS had not invoked that statutory language, or reimbursed on other grounds, strike-related expenses: it had only paid the nursing homes' daily rate.

Moreover, the State has never, before or since, utilized section 17b–340 to fund the costs of collectively bargained contracts.

In 1999, DSS did not send a notice to nursing homes that reimbursement was available. Starkowski received and processed, on an *ad hoc* basis, extraordinary-cost reimbursement requests under Medicaid for strike-related costs paid by nursing homes and attributable to the Medicaid portion of their population. In calendar years 1999 and 2000, the State paid $723,254 to sixteen nursing homes for these strike-related reimbursements, including non-refundable deposits for replacement workers and security. District 1199 was unaware of the State's payment of these extraordinary-cost reimbursements.

C. Preparation for the 2001 Labor Dispute

In September 2000, Jerome P. Brown ("Brown"), President of District 1199, met with Ryan and Starkowski to review Brown's demands, particularly with respect to increases in nursing-home wages and benefits and staffing improvements. At the meeting, Brown discussed increased contract costs of approximately five or six percent. Although a budget proposal had not been made to the legislature, the state officials knew that the Governor was considering funds for an estimated 2½ % rate increase. Ryan and Starkowski concluded, but did not inform Brown, that, in light of Brown's demands and the State's budget situation, there was very likely going to be a strike in 2001 that could simultaneously impact over forty nursing homes, which had a common contract expiration date of March 15, 2001.

---

**13.** As Deputy Commissioner of Administration at DSS, Starkowski is responsible for the public administration and management of the agency's medical care programs, including Medicaid. His responsibilities include rate-setting and certificate-of-need functions, as well as the Medicaid provider financial claims processing and applicable federal reimbursement functions.

The State and the nursing-home industry began strike preparations. Ryan first discussed with Governor Rowland, in October 2000, the payment of anticipatory subsidies to nursing homes for estimated strike-related costs in connection with possible strikes in 2001. On October 17, 2000, state officials met with representatives of the nursing-home industry to discuss the nursing-home contingency plans and to inform industry representatives that DSS, DPH, and other state agencies would notify nursing homes of the deadline for and the content of the contingency plans. On November 21, 2000, state officials met again with nursing-home representatives and discussed, among other things in anticipation of a strike by District 1199, how the nursing homes would obtain a sufficient number of replacement workers. The Connecticut Association of Health Care Facilities ("CAHCF")[14] informed Ryan that it was contemplating the formation of a new corporate entity to contract with U.S. Nursing Corporation for replacement workers in the event of a strike.

During these meetings, Toni Fatone ("Fatone"), CAHCF's Executive Director, informed state officials that the nursing homes with expiring contracts were financially vulnerable, given their cash-flow situation as a result of the history of Medicaid funding in the past ten years, and that the majority of the nursing homes were in bankruptcy proceedings. When Fatone made these statements to state officials, she did not provide specific information about individual nursing homes. She also did not have evidence that all the affected nursing homes were financially vulnerable. Fatone's information was based on her episodic experience collecting CAHCF dues from the nursing homes and conversations with the majority of the owners affected by the anticipated job action.

Fatone also explained to state officials the necessity of contracting with out-of-state replacement workers, in light of the worker shortage at local nursing pools, but she commented on the financial difficulty most nursing homes would confront because the out-of-state agencies required payment in advance of services. Throughout 2000, Fatone, as a representative of CAHCF, had explored the working shortage in local nursing pools with representatives of other hospital and nursing-home associations. Based on difficulties obtaining sufficient staff on any given day, Fatone believed that a job action involving several thousand replacement workers was beyond the capacity of the local agencies. Further, Fatone believed that the availability of staff from local agencies would be reduced because local workers were unwilling to cross picket lines. Accordingly, Fatone concluded that nursing homes had to rely on out-of-state replacement workers to maintain staffing levels for any job action on the scale anticipated.[15]

On December 4, 2000, Ryan, in anticipation of a strike, called a meeting of various state agencies, including representatives from DPH, DSS, the Department of Men-

---

14. CAHCF is a trade association of for-profit nursing homes. Approximately seventy-five to eighty percent of CAHCF members are non-union nursing homes. Larry Santilli, CEO of Athena Healthcare, a chain of seventeen non-union Connecticut nursing homes, is the President of CAHCF. Toni Fatone is the Executive Director of CAHCF and has held that position for six years. Fatone reports to an executive committee of the CAHCF Board of Directors and the Board of Directors, and her job duties include lobbying, public relations, and coordinating educational activities for members.

15. Although the court finds that Fatone conveyed these "facts," and others described in the preceding paragraph, to state officials at the meetings, the court does not find as fact Fatone's description of the nursing-home industry, except where such information is stated elsewhere as a finding by the court.

tal Retardation, OEM, the State Police, the State National Guard, and DOT, to update their 1999 contingency plans. Some individuals present at the meeting expressed concerns about the availability of temporary replacement workers. DPH representatives talked about the process for license renewals and the certification of out-of-state nurses.[16]

At the December 4 meeting, Ryan indicated that, based on the legislative priorities of the Governor and the executive branch, he did not foresee increases in the Medicaid budget similar to those in 1999. He expressed his opinion that the legislature would not add more money to the Medicaid appropriation. Ryan explained, however, that money would be available to ensure patient care during a strike.

On December 22, 2000, DSS managers met to discuss the agency's role in the event of a strike. They agreed that DSS would prepare a pamphlet for families of nursing-home residents explaining what was happening. They also discussed the long-term-care ombudsman's role in order to make sure that any complaints were addressed and that the residents for whom DSS has been appointed as conservator were going to be monitored.

In its planning process, DSS considered some alternatives for handling the cost of replacement workers for the affected nursing homes. DSS discussed whether it was appropriate for the State itself to contract with a replacement-worker service in the event of a widespread strike, but ultimately rejected the idea as inappropriate. Similarly, DSS rejected as inappropriate a proposal to contract with CAHCF to have it obtain replacement workers. The State also considered advancing money to the nursing homes from future daily-rate payments. The State rejected that proposal because state officials, looking at the affected nursing homes as an undifferentiated group, considered the facilities too financially fragile to survive in the future without the full daily rate; they concluded that any repayment schedule would be burdensome and financially debilitating.

Before the March job action, DSS contacted the Health Care Financing Administration ("HCFA"),[17] the federal agency overseeing Medicaid, to determine whether strike-related, nursing-replacement expenses would be reimbursable costs under the Medicaid program. Based on the information provided by DSS, the HCFA official responded informally that the expenses should be reimbursable. DSS subsequently submitted claims for the anticipatory subsidies, which HCFA has processed. The costs paid by the federal government remain subject to audit.[18]

In late December 2000 and continuing in January and February 2001, state officials met, as part of an inter-agency task force, to further prepare for a possible strike and for oversight of residents' health and safety in the event of a strike. Agency representatives reported on their agency's contingency plans as those plans were updated or revised. The State's comprehensive contingency plan was titled Health Care State Support Plan 2001.

On December 27, 2000, state officials met with several nursing-home operators,

16. Out-of-state nurses had to be registered in Connecticut before they could provide services in the nursing homes.

17. The federal agency is now known as Centers for Medicare and Medicaid Services.

18. State auditors conduct the audit of federal funds provided under Medicaid. They review DSS reports for compliance with federal Medicaid regulations. In addition, an auditor from HCFA, on-site at DSS, reviews claims as they occur. The state auditors submit a report to HCFA after their audit, and HCFA can thereafter question expenses or seek to recoup payments that do not qualify as allowable Medicaid expenses.

their attorneys, and CAHCF representatives to discuss contingency planning in the event District 1199 called a strike. State officials told industry representatives that the State would do everything possible to ensure the safety of the residents in struck nursing homes. Ryan informed nursing homes that Governor Rowland would propose a flat percentage increase for fiscal year 2002 for all nursing homes (union and non-union) in his upcoming budget and that there would be no additional funding.

On January 3, 2001, DSS officials met with Brown and Leslie Frane, Vice President of District 1199, at Brown's request.[19] Brown asked the Commissioner of DSS if the agency could exert some influence in order to get more money so that strikes could be averted. Brown indicated the likelihood of strikes in light of the present circumstances, and DSS informed Brown that the State would not change its recommendation on budget appropriations. The Commissioner indicated that DSS had a responsibility to take steps to protect the health, safety, and welfare of the nursing-home residents and that the agency would take whatever measures it needed to fulfill that obligation. Unaware of the full extent of the State's preparations, Brown indicated that he would do what he had to do for his members.

In early January 2001, to increase efficiency and limit liability, CAHCF created a subsidiary, CAHCF Assistance Corporation,[20] that contracted with U.S. Nursing to provide replacement workers in anticipation of District 1199 strikes. Members of this corporation paid the initial retainer fee to U.S. Nursing. In January, the corporation established a committee called the Union Task Force composed of some of the employers whose union contracts would expire on March 15, 2001. The Union Task Force consisted of CAHCF members, such as Genesis, Kindred, Lexington, Roncalli, and Atrium Plaza, and CAHCF non-members, such as St. Mary's Home, Jewish Home, Olympus, Mariner, and Affinity. The Union Task Force met regularly throughout the 2001 labor dispute, and Fatone frequently attended those meetings.

In January 2001, Brian Mattiello ("Mattiello"), Undersecretary of OPM, was assigned responsibility for oversight of the Health Care State Support Plan ("Comprehensive Plan"). He worked with OEM to coordinate inter-agency response to the possible strikes. OEM facilitated meetings among affected state agencies and developed a comprehensive plan for responding to the potential strikes at 51 nursing homes and approximately 169 group homes.[21] OEM, in conjunction with

19. State officials initiated meetings regularly with CAHCF representatives and nursing-home owners in anticipation of the 2001 job actions. They stated that the meetings were conducted in part to facilitate communication and better understand the circumstances of the strikes in order to address concerns about the health and safety of nursing-home residents. State officials, however, never initiated contact with District 1199 to address such concerns before the 2001 strikes.

20. Fatone is the President, Secretary, and Treasurer of the CAHCF Assistance Corporation.

21. District 1199 also sent out strike notices in April 2001 to 169 Department of Mental Retardation group homes for a one-day strike to begin on April 10, 2001. The group homes housed approximately 748 residents. During these strikes, the Department of Mental Retardation provided strike monitors to ensure the health and safety of the residents, and the State used the National Guard for regional emergency response teams.

OPM, coordinated and reviewed the plans of the state agencies to ensure that they were adequate to address all possible contingencies during a nursing-home strike.

For example, anticipating a large-scale job action, DPH sought to avoid later logistical and other planning contingencies that could unnecessarily endanger the health and safety of nursing-home residents if DPH failed to complete its obligations because of staffing or time constraints. DPH, therefore, gathered data from nursing homes about the number of staff, facilities, and residents that would be impacted and the resources available to those facilities. In addition, DPH reassessed its deadlines for strike contingency plans from the nursing homes so that it would not be forced to review forty strike plans in the five days preceding the strike. In order to accommodate the anticipated demand for personnel, DPH also solicited and trained employees from outside the Division of Health Systems Regulation to function as strike monitors.

As the planning process progressed, DSS became concerned that some nursing homes with expiring contracts would not be financially capable of paying strike-related costs. Eleven of the affected homes were either in Chapter 11 bankruptcy proceedings or had just emerged from bankruptcy, and eight homes had interim-relief requests that had been pending at DSS six to eight months without action. Some nursing homes, however, had the financial stability to pay strike-related expenses without anticipatory subsidies from the State.

Relying largely on representations from Fatone, DSS decided that, in light of the financial troubles at some nursing homes and the scale of the anticipated strike, the only viable option was obtaining replacement workers. The State briefly considered, but rejected, other options, such as placing some of the struck nursing homes in receivership, moving some residents out of struck homes to other facilities, and ceasing new admissions. Given its conclusion that the nursing-home industry would require a large number of replacement workers in 2001, DSS further concluded that an out-of-state contractor was the only viable source for replacement workers. In light of the significant costs for out-of-state replacement workers and the financial troubles at some nursing homes, DSS decided that it would provide extraordinary-cost reimbursements for strike-related costs, including expenses for replacement workers.

Further, concerned that *some* nursing homes would not be able to pay U.S. Nursing's charges in advance as required by the contractor, DSS, with the approval of Ryan, determined that anticipatory subsidies were necessary in order to ensure that the level and quality of care and services for the nursing-home residents complied with DPH requirements. In making assessments about the quality of nursing-home care in the event of a strike, DSS did not request or review the nursing-home contingency plans before approving payment of these anticipatory subsidies, even though DPH considers the health and safety of residents protected once it approves a nursing home's strike contingency plan. In providing anticipatory subsidies, the State made no effort to determine whether payments were necessary to protect the health and safety of residents at any particular home. State officials approached the issue of extraordinary costs under section 17b–340 by viewing the statewide job action as a whole.[22] The State concluded,

---

22. The court does not credit any testimony that suggested that some state officials considered each nursing home on a case-by-case basis for purposes of anticipatory subsidies before the March job action.

largely based on its agents' intuition, that anticipatory subsidies were justified without considering the circumstances of individual nursing homes. The State had no formal process for determining if the costs were appropriate; according to Ryan, "it's one of those gut check things." Tr. at 861 1.17.

The court finds that lack of staff as a result of a job action poses an immediate threat to the health and safety of a nursing home's residents. In 2001, the size of the anticipated strike eliminated any option to avoid that threat, other than hiring replacement workers as a response to the expected lack of staff. Approximately 4000 employees engaged in the work stoppage at the forty nursing homes receiving strike notices. Those forty nursing homes house approximately 5200 residents who receive care twenty-four hours a day, seven days a week. Most of those residents require constant supervision, assistance with personal care, multiple medications at varying times, and special diets; many are immobile or require assistance with mobility; many are mentally incompetent; and many require special medical equipment. Local nursing pools could not accommodate the needs of the nursing homes that would be affected by the anticipated strike.[23]

In order to secure replacement workers before the March job action, nursing homes had to rely on out-of-state replacement workers. Additional expenses, such as food, lodging, and transportation, and a nationwide nursing-staff shortage drove up the cost for out-of-state replacement workers. Further, U.S. Nursing, the out-of-state contractor for replacement workers used by almost all nursing homes during the 2001 labor disputes, required that nursing homes pay for worker expenses before services were rendered. If a nursing home did not have the financial ability to pay these costs in a timely fashion, the inability to employ replacement workers would threaten resident health and safety.[24]

The State, however, authorized payments in February 2001 without considering an individual nursing home's financial need for a subsidy in order to provide adequate care during a strike.[25] Starkowski claims that DSS did not have sufficient time or staff to complete an assessment of financial need at individual facilities. However, it was known to the State in the fall of 2000 that a statewide strike was highly likely in light of the union's demands and the Governor's position on the budget. During that period, DSS could have, as DPH did, gathered preliminary information necessary to its decision-making, set deadlines to avoid unnecessarily imposing time constraints on itself, and reassigned employees or sought assistance from other departments for adequate personnel to handle the anticipated workload.

23. Before the job actions in 2001, no one inquired, however, whether other local sources of replacement workers, such as non-union homes, could provide staff.

24. The court notes, however, that less costly options were used during the May job action when some nursing homes had performance issues with U.S. Nursing, the out-of-state corporation that served as the replacement worker contractor for almost all nursing homes. In light of those problems, some nursing homes obtained replacement workers from local nursing pools. Some nursing homes used FIVE–O, a different out-of-state nursing pool, which, in some instances, did not require payment in advance of services.

25. In contrast, the Department of Mental Retardation processed reimbursement requests, for the 2001 job action against the group homes, after the strikes. The agency requested invoices, conducted a full audit of expenses, then processed the reimbursements. Payments issued within nine months of the group homes' requests.

On February 7, 2001, to ensure funding for the anticipatory subsidies, Governor Rowland submitted a supplemental budget to the legislature that included a $5 million line item to cover contingency planning costs of state agencies and nursing homes. These contingency planning costs, which included the worker replacement expenses, were in anticipation of possible nursing-home strikes by District 1199 following expiration of its contracts. The budget also allocated funds for an estimated 2½ % increase in the nursing homes' daily rate.

On the same day the Governor submitted the supplemental budget, DSS sent a memo to nursing homes with expiring union contracts notifying them of the agency's intention to provide anticipatory subsidies for the Medicaid portion of any strike-related costs, including worker replacement costs, as "extraordinary and unanticipated." [26] DSS viewed the strike-related costs as allowable costs under Connecticut General Statutes § 17b–340. To that end, the February 7, 2001 memo advised nursing-home owners what extraordinary expenses would be subsidized in the event of a potential strike or job action. DSS did not promise to cover all strike-related costs, but only those costs that were "extraordinary and necessary for the health and safety of residents." The memo advised the nursing homes how DSS would pay extraordinary or unanticipated costs to avoid an immediate negative impact on the welfare, health, and safety of the nursing-home residents. The memo further notified the nursing homes that they had to comply with the obligations of the NLRA. DSS reserved the right to recover all or, if appropriate, a portion of the anticipatory subsidy if the National Labor Relations

Board ("NLRB") determined that a nursing home had engaged in unfair labor practices.

In preparation for the March 20, 2001 strike and pursuant to the Comprehensive Plan, DOT identified parking facilities on state-owned property where non-striking nursing-home employees and replacement workers could park and be transported to and from nursing homes affected by the strike. The facilities were mostly commuter parking lots. DOT also leased fifty commuter vans at a cost of approximately $200,000 to transport replacement or non-striking workers from the state parking areas in the event the nursing homes were unable to do so. When these expenses were incurred, DOT had no basis to believe that the nursing homes, which had the primary legal obligation to handle transportation and security, could not provide these services.

From January through March 20, 2001, District 1199 met with nineteen nursing-home owners operating fifty-one nursing homes in an effort to negotiate successor contracts to agreements that expired on March 15, 2001. Those negotiations failed to result in any successor contracts by March 20, 2001.

### D. The March 2001 Strikes

On March 6, 2001, District 1199 gave written notification to forty-one of the fifty-one Connecticut nursing homes whose contracts would expire on March 15, 2001, of District 1199's intention to strike on March 20, 2001, beginning at 6:00 a.m.[27] District 1199 scheduled the strike to protest the lack of progress in negotiating new contracts and the owners' unwilling-

---

**26.** No state agency or official informed District 1199 that the State intended to provide anticipatory subsidies for, or even to reimburse after the fact, nursing homes' strike-related expenses.

**27.** Under the NLRA, as amended, District 1199 is required to give a ten-day notice to nursing-home owners of its intention to engage in a strike. *See* 29 U.S.C. § 158(g).

ness to increase staffing in their nursing homes. Shortly after the written notification, District 1199 advised its members that the nursing homes would be struck for only one day, until 7:00 a.m. on March 21, 2001. On March 15, 2001, District 1199 withdrew its strike notice from one of the nursing homes. Also, on March 15, Brown and District 1199 obtained a copy of the February 7, 2001 memo from DSS to the nursing homes concerning anticipatory subsidies for strike-related expenses. On March 16, District 1199 advised the nursing-home owners in writing that it intended its strike to last only twenty-four hours.[28]

After receiving the notice of District 1199's intention to strike, various nursing-home owners, through agreements facilitated by CAHCF, sent staffing orders for replacement workers to U.S. Nursing Corporation, a company located in Colorado. U.S. Nursing required that the nursing homes guarantee payment for sixty hours of work for the replacement workers for the first week and forty-eight hours of work per week thereafter. U.S. Nursing also required a retainer fee and advance deposits before it would commit replacement workers. Before the strike, the nursing homes notified District 1199 that they intended to continue to provide services to nursing-home residents and that they would bring in replacement workers.

On March 20, 2001, at 6:00 a.m., the District 1199 and its members engaged in a strike at forty nursing homes. No violence occurred during the strike. At the end of the one-day strike, on March 21, 2001, sixteen of the struck nursing homes refused to permit the striking employees

to return to work. On March 22, 2001, fifteen nursing homes continued to refuse to permit the striking employees to return to work. On March 23, 2001, thirteen nursing homes refused to permit striking employees to return to work and continued such refusal until Sunday, March 25, 2001, at 6:00 a.m. On March 20, 2001, and on the succeeding days when some District 1199 members were locked out, members of District 1199 and their supporters peacefully picketed the nursing homes.

### 1. Picketing and Public Safety

Before the March job action, District 1199 communicated to local police officials that they intended to obey the lawful orders of the police. On March 7, 2001, Brown met with Lieutenant Colonel Timothy Barry ("Barry") of the Connecticut State Police to discuss District 1199's strike plans.[29] At that time, Brown expressed District 1199's intention to conduct peaceful, orderly picket lines.

Colonel Barry and Brown have had a cordial and friendly professional relationship that dates back at least eight years. They have worked together to accomplish their respective goals without interfering with the other's objectives. For example, when Colonel Barry was a troop commander, he helped Brown stage a public arrest for evening news coverage in exchange for Brown assuring that picketers would carry a driver's license or other identification and conduct themselves peacefully. Colonel Barry arrested fifty individuals, paraded them in front of television cameras to a police van, issued citations with a unified court date, and released the individuals without taking them into custody. Over

---

**28.** For some time before March 16, 2001, it was well-known to the nursing-home owners that District 1199 only intended a one-day strike.

**29.** During the 2001 labor disputes, the role of the State Police was to provide for the public safety. They also worked with local police departments, as requested, and served as the primary police authority in communities that do not have their own police departments.

the years, Colonel Barry and Brown have developed informal methods to maintain and protect public safety and order during District 1199 job actions. Before and during the 2001 labor dispute, the State had no evidence that District 1199 posed a danger of violence or destruction of property.

During the 2001 labor dispute, District 1199 was free to picket and demonstrate anywhere. District 1199 scheduled and held numerous rallies and mass picketing at the State Capitol, at the Governor's offices around the State, and at the Governor's residence. District 1199 expressed its views during the strikes. Moreover, the State Police and District 1199 leaders coordinated larger demonstrations and the arrest of protestors as part of District 1199's efforts to elicit support from the public and state legislators.

2. Finances and Anticipatory Subsidies

Starting on March 14, 2001, six days before the announced strike date, DSS paid anticipatory subsidies to nursing homes to enable them to meet their estimated strike-related expenses. The State did not examine the financial circumstances of the nursing homes individually to determine whether each nursing home required anticipatory payments in order to fulfill its legal obligations to protect the health and safety of residents during the March job action. On March 14, 2001, DSS made payments totaling $2 million to cover strike-preparation costs at the struck nursing homes. In the end, for the March strikes, the subsidies totaled $4,561,000.

The cost of securing replacement workers to fill direct-care positions was used as the basis for estimating each nursing home's strike-related costs because DSS believed it was likely to be the largest expense. Subsidies for strike-related costs included expenses incurred by nursing-home owners for a per diem subsistence rate and lodging for replacement workers. The estimated calculation began with the projected cost of contracting with U.S. Nursing, then added thirty percent as an estimated factor for the additional cost of personnel in non-nursing positions and added fifteen percent as an estimated factor for other costs. These other costs included security, laundry service, and food service during the strikes. DSS then reduced the subtotal by the estimated payroll savings from not paying the striking workers on March 20, 2001 and subsequent days they were on strike or prevented from working by the nursing homes.

Because Medicaid utilization at the forty affected facilities ranged from fifty-six to ninety-four percent, the anticipatory Medicaid subsidies represented fifty-six to ninety-four percent of the estimated strike-related costs. For some nursing homes, their non-Medicaid share of the expenses was significant. For example, for the March 20 strike, Olympus Healthcare Group incurred costs of approximately $250,000 that were not paid for or later reimbursed by DSS. For other nursing homes, the expenses not covered by DSS strike payments were considerably less significant. For example, iCare, which has a ninety-five percent Medicaid population, was eligible for anticipatory subsidies of ninety-five percent of its strike costs.

After the one-day strike ended, the State informed nursing homes that it would pay the full daily rate for nursing homes that allowed union members to return to work, in addition to the anticipatory subsidies already paid for the replacement workers during the sixty-hour minimum retainer period. Depending on a nursing home's Medicaid population, however, the State's offer did not relieve the financial burden of paying both expenses because facilities still had to pay

the non-Medicaid portion of the union members' and the replacement workers' payroll, if striking workers returned.

### 3. "Safety Net"

As part of the Comprehensive Plan developed by the State for the 2001 labor dispute, and on the order of the Governor, three National Guard units were activated. During the course of the March 20, 2001 strike and the succeeding days when some members of District 1199 were locked out by nursing-home owners, non-uniformed members of one National Guard unit drove vans to transport non-striking nursing-home employees and replacement workers to and from struck nursing homes. National Guard personnel transported hundreds of individuals during the March and May strikes.

Two other National Guard units, composed primarily of medical personnel, were on stand-by to provide direct care on an emergency basis in the event the health and safety of residents were threatened because the nursing homes were unable to maintain the required levels of care for their residents.[30] The members of the medical teams remained stationed at National Guard facilities and were not sent to any nursing homes during the March 2001 strike. The National Guard was not otherwise present in any capacity during picketing by District 1199 members and supporters. However, the State had never deployed the National Guard in any capacity during prior job actions in Connecticut.

During the March job action, DPH employees closely monitored each struck facility to ensure that the care of the nursing-home residents complied with federal and state laws and regulations. Monitoring required a significant undertaking with DPH inspectors who made multiple visits each day to each struck nursing home. Additionally, nursing homes were monitored by OEM to ensure that staff arrived on time, that there were adequate levels of staff, and that any issue involving a resident was addressed and corrected. If OEM received a complaint about resident care, DPH was dispatched to investigate the situation and ensure that residents received proper care. Also, in order to maintain resident care, and after fully exploring all other options, the State was appropriately prepared to intervene if U.S. Nursing failed to meet its contractual obligations.

During the course of the March 20, 2001 strike and the succeeding days when members of District 1199 were locked out, and pursuant to the Comprehensive Plan, Connecticut State Police troopers were assigned to perform traffic, crowd control, and related security functions at the four nursing homes located in communities without local police departments.[31] They escorted replacement workers and worked with local police departments, as requested. The State Police also monitored the parking lots that were used as meeting areas and parking facilities.

DOT also executed its portion of the Comprehensive Plan. Although the nursing homes are responsible for transporting replacement workers and non-striking workers who elect to use the common sites, the vans rented by DOT transported workers if the transportation provided by the nurs-

---

**30.** Athena Healthcare, a member of CAHCF, provided pro bono training for National Guard personnel before the strikes. Members of the National Guard wore civilian clothes in carrying out assignments related to the nursing-home strikes.

**31.** State police normally provide law enforcement for communities without an established police force. *See* Conn.Gen.Stat. § 29–5. Also, the mandate of the state police requires that they provide statewide law enforcement, exclusive of Connecticut cities and boroughs. *See* Conn.Gen.Stat. § 29–7.

ing homes failed or was not provided in a timely manner, in order to ensure that workers arrived at the nursing homes. The vans were also used to transport individuals who were concerned about their safety in getting to and from the nursing homes.

At the command center in Hartford, OEM maintained an hour-by-hour log that reported the conditions at the nursing homes, strike-related events, complaints about resident care, and follow-up visits. OEM also monitored for possible problems that might arise with replacement workers to ensure that they arrived on time and worked only the number of hours that it was safe for them to work and to ensure that OEM was aware of the safety concerns of strikers and the public. Mattiello relied on Fatone for information with regard to the nursing homes and used her as an intermediary for communicating with the facilities. OEM provided the information it collected to persons monitoring the strikes and submitted reports to Peter Ellef ("Ellef"), then–Co–Chief of Staff for the Governor.

### E. The May 2001 Strikes

After the March strikes, District 1199 continued to negotiate with the nursing homes without success. In late April 2001, District 1199 again sent out ten-day strike notices for strikes to commence May 1, 2, and 3. In anticipation of the May 2001 strikes, DSS requested that nursing homes provide financial information, including balance sheets, cash-flow projections, estimates of strike costs, and information on other available sources of funding, so DSS could determine whether the nursing homes needed anticipatory subsidies for strike-related expenses.[32] DSS also had

historical financial information on nursing homes based on regular financial reports and data provided with prior requests for interim-rate relief.

The Certificate of Need unit in DSS undertook some effort to analyze the financial needs of the nursing homes to determine whether each home needed anticipatory subsidies in order to secure replacement workers. Based on its limited assessment of St. Mary's and Mariner's financial stability, DSS determined that those nursing homes had the ability to pay the Medicaid portion of their replacement worker costs without an anticipatory subsidy. When the strike started in May, DSS provided anticipatory subsidies to all nursing homes, as requested, except for the two.[33] However, the state did not present evidence sufficient to show what information was reviewed and considered for each home. Based on the inadequate record, the court does not find that, with regard to those nursing homes to which anticipated subsidies were made in connection with the May strike, DSS did so in each instance based on an individual assessment of each nursing home's need for such payment to avoid an immediate threat to residents' health and safety.

Although DSS did not fully evaluate each nursing home's financial stability before the strike, the Certificate of Need unit will conduct post-strike audits of the expenses incurred to determine which expenses will be allowed and will be disallowed. If DSS provided funds in excess of allowable expenses, the agency will recoup those overpayments in future daily-rate payments. As of trial, DSS had not fin-

---

**32.** DSS initiated its financial review in response to the court's preliminary injunction decision on April 17, 2001. *See* Ruling on Plaintiff's Mot. for T.R.O. and Prelim.Inj. [Dkt. No. 28].

**33.** With regard to these two, St. Mary's Home and Mariner, payments were not made until one or two weeks after the costs were incurred.

ished its audit of the strike-related expenses.

During the May job action, DPH, DSS, OEM, and the State Police operated twenty-four hours a day, seven days a week, in part to ensure that there were sufficient workers available at the nursing homes. During the May strike, however, the role of the DOT was reduced, as was the role of the National Guard for providing transportation. The number of staging areas for non-striking employees and replacement workers was also reduced.

However, National Guard members did perform limited medical duties. They were sent to a few homes in order to stabilize the staffing levels when DPH informed OEM that replacement workers did not show up at a shift change and expressed concerns to OEM about the quality of patient care in light of the resultant staffing shortage. Before contacting OEM with regard to staffing problems, DPH consulted with the nursing home about other available credentialed workers, including appropriate overtime staff,[34] administrative staff, and workers from related facilities. If the nursing home could not provide a satisfactory response regarding available staff, DPH contacted OEM. OEM in turn contacted U.S. Nursing about the availability of other replacement workers before sending personnel from the National Guard.

During the May job action, the threat of permanent replacement workers by nursing homes intensified the labor dispute. After the March strikes, District 1199 learned that owners of more than twenty nursing homes might hire permanent replacements in the event of another strike. District 1199 contacted DSS to determine whether the State would provide anticipatory subsidies for nursing homes that hired permanent replacements. DSS notified District 1199 that subsidies for temporary replacement workers would continue, but that any costs for permanent replacements would be handled through a nursing home's daily rate. Subsequently, during the May job action, many nursing homes informed District 1199 that they had hired permanent replacement workers and that they could not be immediately displaced, if District 1199 offered to return all of the strikers to work at one time. Fatone learned from some nursing home owners that permanent replacements had been hired and conveyed that information to the State.

On May 14, 2001, District 1199 convened a statewide meeting at which the ongoing strike was discussed. Union officers told District 1199 members that its strikes were futile in light of the State's anticipatory subsidies and the nursing homes' efforts to obtain permanent replacements. Also, although the Democratic leadership of the legislature had told union officers that they would publicly propose additional funding for nursing homes in the budget process, union officials were disappointed with lack of action by the legislative leaders in addressing the executive branch's anticipatory payments to the nursing homes.[35] The union officers recommended that District 1199 offer to end the strikes and return to work. At the meeting, District 1199 members voted to return to work, despite the lack of contracts. District 1199 issued written offers to return to work "as a group," which offers were rejected by most of the nursing-home owners involved.

---

**34.** DPH reasonably had public-health concerns about having individuals work extended overtime because the responsibilities of nursing personnel are demanding.

**35.** The Connecticut legislature subsequently approved a budget that increased Medicaid funding by $7 million and allocated $25 million to strike-related expenses incurred by the State.

In response to District 1199's offer, some nursing homes locked out District 1199 members. Some nursing homes settled. At other facilities, District 1199 agreed to return to work while negotiations continued. State officials met with Fatone to discuss the various responses by nursing homes to District 1199's offer to return to work. The State decided to continue anticipatory subsidies, even for facilities that refused to allow striking employees to return to work.

By late May, only one nursing-home owner, iCare, continued to lock out District 1199 members. In light of other settlements and District 1199's offer of similar terms to iCare, the Governor and other state officials concluded that iCare was being intransigent and should be pressured to return to the negotiating table. Ryan testified that iCare's intransigence was just not fair. Tr. 788, 1. 18–19. As Starkowski put it: "Let's call this, let's tell them, come on, move it." Tr. 272, 1. 11–12. The State warned iCare, through Fatone, that it would cease anticipatory Medicaid subsidies. Ninety-five percent of iCare's residents were Medicaid eligible. On June 1, iCare sent a written objection to DSS.

State officials had no assurances that iCare would immediately settle with District 1199 if anticipatory payments ceased, but they had a "gut feeling" that iCare would settle quickly. The State knew that the health and safety of the residents might be jeopardized, but the State did not have plans in place if iCare did not settle and the continued strike threatened the health and safety of residents. Further, before the State stopped the payments, it did not explore any alternatives that would maintain the health and safety of the residents. After the State ceased the anticipatory Medicaid subsidies, iCare settled with District 1199 on its offered terms

within a few days. The May job action ended on June 5, 2001.

## F. Negotiations

When negotiations with nursing homes began, in anticipation of the contracts expiring in March, District 1199 demanded wage increases, improved benefits, and additional staffing at facilities. Although state officials had concluded that the union's negotiations were futile in light of the Governor's proposed budget and had conveyed that information to the nursing-home owners, state officials never explained to Brown or any other union official the State's strict adherence to the Governor's budgetary policies. Further, before the March job action began, no state official described the extent of the State's preparation for the strike and the steps it was willing to take, in particular the use of anticipatory subsidies, in order to maintain the integrity of the proposed budget and to protect the health and safety of nursing home residents. Accordingly, District 1199 never had an opportunity to appreciate fully the circumstances surrounding its negotiations with the nursing homes in order to determine whether its demands and the subsequent job actions were appropriate, or merely futile or ill-advised in light of the State's efforts.

District 1199 did negotiate one contract without a strike. The union did not send SunBridge a strike notice in March because of the progress in negotiations, and District 1199 settled with SunBridge at the beginning of April. The SunBridge contract included most of the union's demands. District 1199 forwarded copies of the agreement to other nursing homes, in the hope that it could use the SunBridge agreement as a model to pattern contracts at other facilities. All the nursing homes rejected the SunBridge model because they concluded that the State would not

fund the increases set out in the agreement.

In contrast to the negotiation process at SunBridge, after striking at nursing homes in March, District 1199 contacted the employers in order to renew negotiations. Between March 26, 2001 and May 1, 2001, no nursing-home owner improved its prestrike contract offer to the union, no employer proposed staffing improvements, and no employer increased economic offers. Some employers, such as Olympus, Genesis, and Roncalli, made regressive offers—offering less than before the March strike. Olympus proposed that District 1199 substitute a commercial insurance plan—partly paid for by employees—for the union health and welfare fund and that District 1199 eliminate the pension fund and training fund. Genesis made a proposal to end pension contributions at two of its three facilities. Roncalli proposed smaller wage increases than it offered before the strike. Although myriad external factors affect the bargaining positions of parties to a labor dispute, it is unusual that no nursing home was receptive to negotiations after the March strike and that none of the nursing-home owners made any improvements over prior offers after the one-day job action and in light of the pending indefinite job action.

During the May job action, employers that claimed to have hired permanent replacements would only agree to take all strikers back after the union accepted a four-year contract. Employers used the threat of permanent replacements as powerful leverage in the negotiations to pressure District 1199.

Approximately ten days after the union offered to return to work during the May job action, District 1199 settled with Roncalli. The Roncalli settlement had significantly smaller wage increases than demanded by the union, imposed a less generous benefits package on new union members, and had no provisions for staffing improvements. The court credits Brown's testimony that, absent the State's actions during the 2001 job actions, District 1199 never would have accepted the Roncalli settlement.

Because the Roncalli settlement fit within the Governor's proposed budget, however, it became the pattern for agreements with other facilities. Similar contracts were reached with thirty-two of the struck homes and with some other facilities that were not struck, but that had contracts which expired later.[36]

The final settlements with the nursing homes failed to meet several substantive demands sought by District 1199. For the first two years of the contracts, the wage increases were less than inflation. There were no provisions for staffing improvements, and, finally, some contracts reduced workers' benefits. As evidenced by the final settlements and the employers' unusual bargaining positions, the State's policy of subsidizing the Medicaid portion of strike-related costs *before* nursing homes incurred those expenses relieved significant economic pressure on the facilities and, thereby, impacted labor relations between District 1199 and the nursing homes.

### G. Governor Rowland

For the past five or six years, Ryan and Governor Rowland have sought to restructure the State's long-term health care, us-

---

36. Contracts were not entered into at some nursing homes because of special circumstances at the particular facilities. For example, Atrium Plaza in New Haven, which a bankruptcy trustee administers, and the five Olympus facilities, which a State-appointed receiver administers, continue to operate under the provisions of the contracts that expired in 2001.

ing Oregon's health system as a model, by reducing the number of licensed nursing-home beds, through nursing-home closures and other means, while increasing resources for home-care alternatives and assisted-living arrangements. As a direct result of the restructuring, the nursing-home census has declined by over 1000 residents. State officials recognize that the restructuring efforts are a factor that creates further financial pressures on nursing homes, in addition to normal cost pressures on the health-care industry and the shortage of nursing personnel.

In preparation for the 2001 labor dispute, Governor Rowland was briefed on the plans of the inter-agency task force, and state officials kept Ellef apprised of all plans before the strikes occurred and of all major events during the course of the 2001 strikes. The Governor relied on the information conveyed to him by state officials. Also, Fatone met twice in 2001 with Governor Rowland in his office to discuss the effects of the nursing-home strikes.

The first meeting occurred around March 20, 2001 and was arranged at the request of the Governor's office; present at the meeting were Fatone, Governor Rowland, Ryan, the Governor's counsel Anne George, and Dean Pagani, the Governor's press spokesperson. The Governor's office asked Fatone to attend the meeting in order to brief the Governor on the union's one-day strike and the facilities that were delaying the reinstatement of striking workers. In response to the Governor's inquiries, Fatone advised him of the facilities that would be delaying reinstatement of striking workers, and they discussed issues related to patient care.

Fatone's second meeting with the Governor occurred in late April or early May 2001, in the Governor's office with the same participants. The topics discussed at the second meeting, which occurred before the May strike, included the likelihood of another job action. At the meeting, someone solicited Fatone's opinion with regard to the reasonableness of District 1199's tentative contract with SunBridge. Fatone and CAHCF had done an internal analysis of the cost of the tentative SunBridge contract, and Fatone told the Governor that the costs of that contract were fiscally impossible for the provider and the Medicaid program because the contract exceeded the 2½ % rate increase cap in the Governor's proposed budget. In analyzing the SunBridge contract, Fatone and CAHCF assumed, correctly, that Governor Rowland would not provide union and non-union homes different rate increases under the proposed budget; Governor Rowland and other state officials consistently expressed the need to fund union and non-union homes equally.[37] Subsequently, Dean Pagani publicly commented that the State could not afford to fund the cost increases it would take to implement the staffing and pay increases sought by District 1199 in the SunBridge contract.

Beginning in the fall of 2000 and continuing through May 2001, Ryan repeatedly indicated that the amount of money available for nursing homes' Medicaid reimbursement had been set and that the Governor was not going to propose any additional money, because over $200 million had been added to the State budget in 1999 for nursing-home wages and benefits. This position was repeated by Dean Pagani and by the Governor. Governor Rowland did suggest that if the Democratic leadership of the legislature was inclined to add more money to the Medicaid reim-

---

37. Although Fatone did not discuss with the Governor her concern about differences in funding for union and non-union homes that would result from using the SunBridge con-

tract as a pattern for settlement, a CAHCF analyst had discussed this topic directly with Gary Richter at DSS.

bursement allocation for nursing homes, that was their prerogative and that the Governor would discuss it.

The Governor perceived the issue as financial. From Governor Rowland's perspective, the legislative leadership and his administration set the rate increase for nursing-home costs after considering the needs of all the nursing homes, funding all employers, union and non-union, equally, without regard to the contracts at any individual nursing home. Once the State determined the rate increase, Governor Rowland considered any strike futile because of his unwavering position that no additional money would be allocated.

The conduct and internal memoranda of state officials reflect the Governor's viewpoint. Although state officials elicited information and aid from CACHF, as the representative of the nursing-home industry, District 1199 was not informed of or included in the State's preparations for the 2001 job actions. When only iCare remained as a holdout from settling with District 1199 during the May strikes, the State concluded, without regard to the health and safety of iCare residents, that anticipatory payments, covering ninety-five percent of iCare's replacement worker costs, were no longer warranted because the Governor and other state officials believed it was in everyone's best interest if management at iCare returned to the negotiating table. The State also rejected settlement efforts, such as the SunBridge contract, that did not conform to the State's budget proposal because the State expected the money to be allocated equally between union and non-union nursing homes.

The language of Ryan's confidential memorandum to the Governor, on which the Governor was debriefed, is illustrative of the focus of state officials. Ryan stated, "[I]t is a miracle that Jerry caved and accepted something that deviates little from the Appropriations Committee." Exh. 81, at 1. Further, Ryan expressed the concern that if the State accepted any efforts to "pass through" the costs of union contracts, then more nursing homes would unionize, leading to a significant increase in nursing-home costs. Referring to District 1199 and its political allies, Ryan concluded his financial analysis of a proposed legislative settlement: "They had nowhere to go this year—you boxed them out." *Id.* at 5.

Governor Rowland and District 1199 have been on opposite sides of many issues. The Governor does not consider District 1199 a political ally. During the 2001 job actions, Governor Rowland made several public comments entreating District 1199 members to disregard union leadership and remain at work. Further, the Governor publicly questioned Brown's credibility. Governor Rowland also threatened that money allocated for the nursing-home budget and any potential increases may be reduced by expenses incurred for replacement workers. On several occasions, the Governor encouraged District 1199 and nursing-home owners to negotiate in good faith, in light of the financial restraints imposed by the Governor's proposed budget.

Although the Governor's public comments intimidated some members of District 1199, the court finds, based on Brown's testimony, that no members returned to work or refused to follow union leadership based on those comments. District 1199 conducted all its normal strike-related activities during the 2001 job actions. Moreover, the union focused additional attention on the Governor—for example, protesting or demonstrating at many of his public appearances.

## H. The Birmingham Strike Notices

Birmingham Health Care is a small to average facility, with approximately 120

residents, seventy-five percent of whom are Medicaid eligible. The facility has not been in bankruptcy proceedings within the past several years. The contract between Birmingham and District 1199 expired in November 2001. In late November, when District 1199 and Birmingham were unable to agree on a successor contract for its approximately ninety union members, District 1199 sent a ten-day strike notice for a job action on December 3, 2001. There were no other pending strike notices by District 1199 at any other nursing home in the state. Birmingham notified District 1199 that it intended to hire permanent replacements for approximately half the workers.

District 1199 attempted to ascertain whether the State would make anticipatory payments for Birmingham's strike-related expenses. The State informed the union that it was evaluating a request for anticipatory subsidies. In light of the threatened use of permanent replacements, District 1199 canceled the strike notice. Birmingham contracted with an out-of-state nursing pool for replacement workers before the cancellation and refused to permit District 1199 members to work for five days from the date set for the strike. Birmingham allowed the workers to return on December 8.

Although the State had explored alternatives to anticipatory subsidies before the March job action, DSS provided Birmingham anticipatory subsidies for its strike-related expenses without considering other options available to address concerns about the health and safety of its residents. The State reviewed Birmingham's most recent cost reports, a three-month review of its cash flow, and its historical financial situation. Further, DSS inquired whether Birmingham had access to in-state nursing pools, but was informed that the local agencies were reluctant to cross picket lines. The State did not advance Birmingham the total amount it requested.

After further negotiations, District 1199 sent another ten-day strike notice in late December for a strike beginning on December 30, 2001. Birmingham again threatened to hire permanent replacements. Several days before December 30, District 1199 canceled the scheduled strike. Birmingham refused to allow District 1199 members to work from December 30 to January 3, 2002, and the State again provided anticipatory subsidies for less than Birmingham's estimated strike-related expenses based on an analysis of the facility's cash flow and projected shortfall. District 1199 eventually settled with Birmingham after making a significant concession on health insurance for its members.

OEM was aware of the Birmingham strike notices, but did not coordinate the efforts of the other state agencies as it did during the March and May strikes. Further, the National Guard and DOT did not serve any role in preparation for or during the events surrounding the Birmingham strike notices.

## II. CONCLUSIONS OF LAW

### A. Jurisdiction

The court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983.

### B. NLRA Preemption

District 1199 is a labor organization within the meaning of Section 2(a) of the NLRA, 29 U.S.C. § 152(5). The union claims that the NLRA preempted the defendants' anticipatory subsidies and use of state resources during the nursing-home strikes. Accordingly, District 1199 seeks a declaratory judgment that the State's strike-related Medicaid payments to nurs-

ing homes outside the daily rate, that the State's use of National Guard personnel, and that the State's use of vans to transport replacement and non-striking workers interfered with District 1199's rights under the NLRA.

■ Under the Supremacy Clause of the United States Constitution, state law is preempted where Congress explicitly states an intent to occupy a field and exclude state regulation; where the federal interest in the subject matter regulated is so dominant that no room remains for state action, indicating an implicit intent to occupy the field; and where the state regulation at issue conflicts with federal law or stands as an obstacle to the accomplishment of its objectives. *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203–04, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983); *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982); *Sprint Spectrum L.P. v. Mills*, 283 F.3d 404, 414–15 (2d Cir.2002) (citing cases); *cf.* U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land."). Federal law may preempt state regulation in whole or in part. *Mich. Canners & Freezers Ass'n v. Agric. Mktg. & Bargaining Bd.*, 467 U.S. 461, 469, 104 S.Ct. 2518, 81 L.Ed.2d 399 (1984); *Sprint Spectrum*, 283 F.3d at 415.

■ Although not a source of a federal right by itself, the Supremacy Clause " 'secure[s] federal rights by according them priority whenever they come in conflict with state law.' " *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 107, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989) [hereinafter *Golden State II* ] (quoting *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 613, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979)). A plaintiff may enforce a Supremacy Clause claim under Section 1983 of Title 42 of the United States Code where it is based on a statutory violation and the statute in question creates "rights, privileges, or immunities" in the plaintiff. *Id.* at 108 n. 4, 110 S.Ct. 444.

Federal labor law creates the rights at issue in this case. The Supreme Court has recognized that Congress, in enacting the NLRA, manifested an unambiguous intent to supplant some aspects of state law that affect labor relations. *Bethlehem Steel Co. v. N.Y. State Labor Relations Bd.*, 330 U.S. 767, 771–76, 67 S.Ct. 1026, 91 L.Ed. 1234 (1947). "The doctrine of labor law preemption concerns the extent to which Congress has placed implicit limits on 'the permissible scope of state regulation of activity touching upon labor-management relations.' " *N.Y. Tel. Co. v. N.Y. State Dep't of Labor*, 440 U.S. 519, 527, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979) (plurality opinion) (quoting *Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters*, 436 U.S. 180, 187, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978)). However, since the NLRA "leaves much to the states [and] Congress has refrained from [indicating] how much[, courts] must spell out from conflicting indications of congressional will the area in which state action is still permissible." *Garner v. Teamsters, Chauffeurs & Helpers Local Union*, 346 U.S. 485, 488, 74 S.Ct. 161, 98 L.Ed. 228 (1953). "Cases that have held state authority to be pre-empted by federal law tend to fall into one of two categories: (1) those that reflect the concern that 'one forum would enjoin, as illegal, conduct which the other forum would find legal' and (2) those that reflect the concern 'that the (application of state law by) state courts would restrict the exercise of rights guaranteed by the Federal Acts.' " *Lodge 76, Int'l Ass'n of Machinists and Aerospace Workers v. Wis. Employment Relations Comm'n*, 427

U.S. 132, 138, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976) [hereinafter *Machinists* ] (quoting *UAW v. Russell*, 356 U.S. 634, 644, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958)).

The first category of preemption developed from a line of cases that focused on the primary jurisdiction of the NLRB. *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 244–47, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). *Garmon* and its progeny hold that the NLRA preempts state regulation that either prohibits conduct subject to the regulatory jurisdiction of the NLRB under Section 8 of the NLRA or facilitates conduct prohibited by Section 7 of the NLRA. *Id.; Amalgamated Ass'n of Street Elec. Ry. & Motor Coach Employees v. Lockridge*, 403 U.S. 274, 290–91, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971). In this case, the plaintiff does not claim that the defendants' actions prohibited conduct subject to the regulatory jurisdiction of the NLRB under Section 8 of the NLRA or facilitated conduct prohibited by Section 7 of the NLRA. Thus, *Garmon* preemption does not apply.

The second category of preemption focuses on "whether Congress intended that the conduct involved be unregulated because [such conduct was] left 'to be controlled by the free play of economic forces.' " *Machinists*, 427 U.S. at 140, 96 S.Ct. 2548 (quoting *NLRB v. Nash–Finch Co.*, 404 U.S. 138, 144, 92 S.Ct. 373, 30 L.Ed.2d 328 (1971)). *Machinists* held that:

neither States nor the [NLRB] is "afforded flexibility in picking and choosing which economic devices of labor and management shall be branded as unlawful." ... [B]oth are without authority to attempt to "introduce some standard of properly 'balanced' bargaining power" or to define "what economic sanctions might be permitted negotiating parties in an 'ideal' or 'balanced' state of collective bargaining."

*Id.* at 149–50, 96 S.Ct. 2548 (citations omitted) (quoting *NLRB v. Ins. Agents' Int'l Union*, 361 U.S. 477, 497, 500, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960)). Thus, states may not "deny[ ] one party to an economic contest a weapon that Congress meant him to have available." *Id.* at 150, 96 S.Ct. 2548 (internal quotation omitted). The "crucial inquiry" under *Machinists* is "whether the exercise of state authority to curtail or entirely prohibit self-help would frustrate effective implementation of the policies of the National Labor Relations Act." *N.Y. Tel.*, 440 U.S. at 531, 99 S.Ct. 1328 (plurality opinion).

Under *Machinists*, "States are ... prohibited from imposing additional restrictions on economic weapons of self-help ... unless such restrictions presumably were contemplated by Congress." *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 614–15, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986) [hereinafter *Golden State I* ]. "The NLRA is concerned primarily with establishing an equitable process for determining terms and conditions of employment, not with particular substantive terms of the bargain that is struck when the parties are negotiating from relatively equal positions." *Metro. Life Ins. Co. v. Mass.*, 471 U.S. 724, 753, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985). However, "Congress developed the framework for self-organization and collective bargaining of the NLRA within the larger body of state law promoting public health and safety." *Id.* at 756, 105 S.Ct. 2380. "Federal labor law in this sense is interstitial, supplementing state law where compatible, and supplanting it only when it prevents the accomplishment of the purposes of the federal Act." *Id.* Thus, state or local action is preempted if it regulates the use of economic weapons that are recognized and protected under the NLRA such that the state or local government has entered " 'into the substantive aspects of the bargaining process to an extent

Congress has not countenanced.'" *Machinists*, 427 U.S. at 149, 96 S.Ct. 2548 (quoting *Ins. Agents*, 361 U.S. at 498, 80 S.Ct. 419); *see also N.Y. Tel.*, 440 U.S. at 533, 99 S.Ct. 1328.

▮ In order to determine whether state action is preempted in this case, the court will examine: 1) whether the state action regulated the use of economic weapons protected by the NLRA; 2) whether the state action alters the economic balance between labor and management; and 3) whether Congress expected the defendants to interfere in the bargaining process in the manner and to the extent they did. District 1199 has the burden of proof on all elements. The Supreme Court has suggested, however, that a defendant must present evidence of congressional intent where an actual conflict with federal labor law exists. *See Golden State I*, 475 U.S. at 617, 106 S.Ct. 1395 (examining the evidence of congressional intent produced by the defendant municipality for relief from NLRA preemption); *N.Y. Tel.*, 440 U.S. at 548–49, 99 S.Ct. 1328 (Blackmun, J., concurring), 566–67 (Powell, J., dissenting).

▮ Based on this precedent, the court concludes that proof of the first two elements, which would establish a prima facie actual conflict between state regulation and federal labor law, raises a rebuttable presumption that Congress intended to preempt state law absent an exception to preemption or evidence of Congress's intent not to preempt state law in a particular case. *Palm Beach Co. v. Journeymen's & Prod. Allied Servs. Int'l Union Local 157*, 519 F.Supp. 705, 710 & n. 7 (S.D.N.Y.1981). Accordingly, if the plaintiff establishes the first two elements of preemption, the defendants have the burden of production for any exception to preemption or evidence of congressional

intent not to preempt their actions in this case.

### 1. State Regulation

▮ a. *Protected Activity*. Federal labor law grants the parties to a labor dispute the use of permissible economic tactics, including the right to strike peacefully. *E.g., Golden State II*, 493 U.S. at 111, 110 S.Ct. 444; *UAW v. O'Brien*, 339 U.S. 454, 457, 70 S.Ct. 781, 94 L.Ed. 978 (1950). The right to strike is a "[p]ermissible economic tactic[ ] that ... employees have a right to use without state infringement." *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 364 (4th Cir.1991). When it amended the NLRA in 1974, Congress explicitly granted nursing-home employees the right to strike, subject only to a ten-day notice. *See* 29 U.S.C. § 158(g). Therefore, the court concludes that District 1199's activities were protected under the NLRA.

b. *Proprietary Action vs. Regulation.* The defendants have argued that their actions did not regulate District 1199's activities because the defendants' actions were proprietary in nature and, thus, subject to a market-participant exception to *Machinists* preemption. *See Bldg. & Constr. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993) [hereinafter *Boston Harbor* ]. The defendants argue that their actions were proprietary in nature because DSS purchased the services of privately owned nursing homes on behalf of Medicaid-benefits recipients. The defendants claim that District 1199's strikes threatened to disrupt the services purchased by the State and, accordingly, justified the State reimbursing strike-related expenses to ensure uninterrupted services.[38]

---

**38.** The court notes that the defendant appropriately focus on the State's anticipatory subsidies for strike-related expenses, not its use of the National Guard and other state re-

In Boston Harbor, the Supreme Court held that proprietary state action would not be considered state regulation for purposes of the preemption doctrine, even if the state action impacted zones of protected activity. *Boston Harbor*, 507 U.S. at 227, 113 S.Ct. 1190. In Boston Harbor, the state in soliciting contractor bids for a state project on state property, required successful bidders to abide by an otherwise lawful, pre-hire collective bargaining agreement. *Id.* at 221–22, 113 S.Ct. 1190. The Boston Harbor Court focused on actions taken by the state in its role as proprietor or purchaser, as opposed to its role as regulator. *Id.* at 229, 113 S.Ct. 1190.

First, the Court distinguished *Wisconsin Department of Industry, Labor & Human Relations v. Gould Inc.*, 475 U.S. 282, 283, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986), where Wisconsin refused to hire or do business with persons who violated the NLRA three times in the preceding five years. The *Boston Harbor* Court concluded that:

> [b]ecause the statute at issue in *Gould* addressed employer conduct unrelated to the employer's performance of contractual obligations to the State, and because the State's reason for such conduct was to deter NLRA violations ... "Wisconsin 'simply is not functioning as a private purchaser of services,' ... [and therefore,] for all practical purposes, Wisconsin's debarment scheme is tantamount to regulation."

*Boston Harbor*, 507 U.S. at 228–29, 113 S.Ct. 1190 (quoting *Gould*, 475 U.S. at 289, 106 S.Ct. 1057).

The *Boston Harbor* Court then held that, "[i]n the absence of any express or implied indication by Congress that a State may not manage its own property when it pursues its purely proprietary interests, and where analogous private conduct would be permitted, this Court will not infer such a restriction." *Id.* at 231–32, 113 S.Ct. 1190. "To the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a prehire agreement, a public entity *as purchaser* should be permitted to do the same." *Id.* at 231, 113 S.Ct. 1190. Thus, "a State may act without offending the pre-emption principles of the NLRA when it acts as a proprietor and its acts therefore are not 'tantamount to regulation' or policymaking." *Id.* at 229, 113 S.Ct. 1190.

 The Fifth Circuit has developed a standard for distinguishing the narrow category of proprietary acts under *Boston Harbor* from regulation subject to preemption. *Cardinal Towing & Auto Repair, Inc. v. City of Bedford*, 180 F.3d 686, 691, 691 (5th Cir.1999) ("The law has traditionally recognized a distinction between ... actions taken to serve the government's own needs rather than those of society as a whole. ... [W]hen a state or municipality acts as a participant in the market and does so in a narrow and focused manner consistent with the behavior of other market participants, such action does not con-

---

sources, as proprietary in nature. As developed in more detail within the text, the market-participant exception does not apply to situations where a private actor could not, or typically would not, act as the State did here. *See Boston Harbor*, 507 U.S. at 231, 113 S.Ct. 1190; *Sprint Spectrum L.P. v. Mills*, 283 F.3d 404, 420 (2d Cir.2002); *Cardinal Towing & Auto Repair, Inc. v. City of Bedford*, 180 F.3d

686, 693 (5th Cir.1999). No ordinary private party to a labor dispute could, or typically would, mobilize the National Guard or coordinate expansive and expensive resources to provide a safety net for nursing-home residents. Accordingly, the court considers any argument regarding the market-participant exception as addressed only to the plaintiff's claims regarding use of Medicaid funds.

stitute regulation subject to preemption."), *cited with approval in Sprint Spectrum,* 283 F.3d at 420. To determine whether government action is "so narrowly focused, and so in keeping with the ordinary behavior of private parties, that a regulatory impulse can be safely ruled out," the court considers (1) whether "the challenged action essentially reflect[s] the entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances," and (2) whether "the narrow scope of the challenged action defeat[s] an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem." *Id.* at 693.

 In this case, the State's actions sought to ensure continuous services to the nursing-home residents. Its actions, however, exceeded the typical behavior of other private parties in these circumstances. There is no evidence that non-Medicaid residents paid their portion of the strike-related costs or that the nursing homes explored the possibility of seeking funds from the non-Medicaid residents for strike-related expenses, as they did from the State. Therefore, while the State's conduct focused on ensuring uninterrupted

procurement of services, its behavior was not typical of other similarly situated participants in the market.

Moreover, the defendants' actions were policy-oriented, not proprietary. The State claims that its actions were taken pursuant to government obligations to provide Medicaid benefits. *See* 42 U.S.C. §§ 1396 *et seq.* It satisfies those obligations according to federal and state statutes, regulations, and policies. *E.g., id.;* 42 C.F.R. § 430.0 *et seq.;* Conn.Gen.Stat. § 17b–220 *et seq.* Unlike the "purely proprietary" interests in Boston Harbor, the defendants in this case acted in accordance with government objectives regarding medical assistance programs. *See Keystone Chapter v. Foley,* 37 F.3d 945, 955 n. 15 (3d Cir.1994) (rejecting a Boston Harbor market-participant argument, where *amicus curiae* contended that state action pursuant to the Pennsylvania Prevailing Wage Act was proprietary in nature, because the statute sought to achieve a governmental objective of ensuring adequate wages and because the state argued in its briefs that it had traditional police powers to establish labor standards). Therefore, the court concludes that the defendants' actions were not typical of a private party and had a primary objective to further the State's policies with regard to Medicaid, not a "purely proprietary" concern.[39] The

---

**39.** As additional proof of regulatory interest, the court notes that the State's choices during the job actions evidenced its decisions to ensure union contracts within the rate increase set by the proposed budget and to fund union and non-union nursing homes equally, both of which were policies of the Governor. For example, the State rejected the SunBridge contract—negotiated without a strike by District 1199—and other "pass through" options, in part, because, within a fixed budget ceiling of 2½ %, they would lead to disparities in favor of union nursing homes that the State was not prepared to fund. Also, once District 1199 acquiesced to the State's budget constraints in contract negotiations, the State changed its approach toward iCare, the holdout nursing home, in order to facilitate settlement. State officials admitted that their deci-

sions focused on the financial implications of the union's strike on the Governor's budget proposal for nursing-home rate increases.

However, the court does not rely on this evidence for its conclusion regarding the market-participant exception. The court is concerned that this evidence treads too closely to consideration of subjective motivation, which is not relevant to the market-participant exception to preemption. *See, e.g., Colfax Corp. v. Ill. State Toll Highway Auth.,* 79 F.3d 631, 635 (7th Cir.1996); *Chamber of Commerce v. Reich,* 74 F.3d 1322, 1335–36 (D.C.Cir.1996); *Legal Aid Soc'y v. City of New York,* 114 F.Supp.2d 204, 237–38 (S.D.N.Y.2000) (noting that the market-participant exception should focus on the objective effects of state regulation to avoid different results for differ-

State's actions, thus, are not within the purview of the Boston Harbor market-participant exception to *Machinists* preemption.

c. *Regulation.* The court notes that the defendants' actions did not regulate District 1199's conduct in any direct sense. However, the Supreme Court, in *New York Telephone*, recognized that NLRA preemption cannot focus solely on the conduct regulated, but must also consider "the scope, purport, and impact of the state program." *N.Y. Tel. Co. v. N.Y. State Dep't of Labor,* 440 U.S. 519, 532 n. 21, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979) (plurality opinion); *accord Livadas v. Bradshaw,* 512 U.S. 107, 119, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994). In this case, the defendants acted within a regulatory scheme that focused on ensuring the health and safety of the public, not on regulating the bargaining relationship between labor and management. Yet, that regulatory scheme, the defendants' policy decisions within that scheme, and the State's use of the National Guard and other state resources had a clearly discernible impact on the labor-management relationship. Because the defendants' policy decisions constitute regulation, as that word is used in the preemption area, and that regulation had an effect on District 1199's protected activities, the court will proceed to the second issue involved in *Machinists* preemption, whether the defendants' actions altered the economic balance between labor and management as established by the NLRA.

2. Economic Balance

By enacting the NLRA, Congress established a structure for labor disputes that it implicitly intended to preempt state action. *Machinists,* 427 U.S. 132, 145–46, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976); *Local 20, Teamsters, Chauffeurs & Helpers Union v. Morton,* 377 U.S. 252, 258–59, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964). "Congress struck the 'balance . . . between the uncontrolled power of management and labor to further their respective interests.' " *Morton,* 377 U.S. at 259, 84 S.Ct. 1253 (quoting *Local 1976, United Bhd. of Carpenters v. NLRB,* 357 U.S. 93, 100, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958)) (alteration in original). Within the structure established by the NLRA, Congress intended that any conduct left unregulated be "controlled by the free play of economic forces." *Machinists,* 427 U.S. at 140, 96 S.Ct. 2548 (quoting *NLRB v. Nash–Finch Co.,* 404 U.S. 138, 144, 92 S.Ct. 373, 30 L.Ed.2d 328 (1971)) (internal quotation omitted); *accord Metro. Life Ins. Co. v. Mass.,* 471 U.S. 724, 750–51, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985); *Garner v. Teamsters, Chauffeurs & Helpers Local Union,* 346 U.S. 485, 500, 74 S.Ct. 161, 98 L.Ed. 228 (1953) ("For a state to impinge on the area of labor combat designed to be free is quite as much an obstruction of federal policy as if the state were to declare picketing free for purposes or by methods which the federal Act prohibits.").

However, not all state action that affects the labor-management relationship would "frustrate the effective implementation of the policies of the [NLRA]." *N.Y. Tel.,* 440 U.S. at 531, 99 S.Ct. 1328 (plurality opinion). Only state action that alters the economic balance between labor and management would be subject to preemption. *Id.* at 531–32, 99 S.Ct. 1328; *Metro. Life,* 471 U.S. at 750, 105 S.Ct. 2380.

State action that subsidizes economic self-help during a labor dispute does alter the economic balance. *See N.Y. Tel.,* 440 U.S. at 531–32 n. 20, 99 S.Ct. 1328 (plurality opinion); *Super Tire Eng'g Co. v. McCorkle,* 416 U.S. 115, 123–24, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974) ("It cannot be

---

ent state actors and citing circuits other than the Second Circuit for a similar holding).

doubted that the availability of state welfare assistance for striking workers in New Jersey pervades every work stoppage, affects every existing collective-bargaining agreement, and is a factor lurking in the background of every incipient labor contract."); *Mass. Nurses Ass'n v. Dukakis*, 726 F.2d 41, 43 n. 2 (1st Cir.1984) (observing that "giving strikers financial assistance far more intimately and directly affects the balance of forces in a collective bargaining context than the general hospital cost containment approach [at issue in that case]"); *cf. Ohio Bureau of Employment Servs. v. Hodory*, 431 U.S. 471, 492, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977) (accepting a District Court's characterization of state unemployment compensation as a subsidy within the strike-lockout context). Therefore, the court concludes that state subsidies in the form of anticipatory Medicaid payments and state resources, such as services of the National Guard and transportation vehicles, altered the economic balance between labor and management in this case. Thus, the court will turn to the third issue under *Machinists* preemption.

### 3. Intent of Congress

 Because the plaintiff has established an actual conflict between the state action in this case and federal labor law, the court must address whether Congress contemplated that the State would interfere in the bargaining process in the manner and to the extent that it did in 2001. Where the State subsidizes a party to a labor dispute, "[t]he question, of course, is whether Congress, explicitly or implicitly, has ruled out such assistance in its calculus of laws regulating labor-management disputes." *Super Tire*, 416 U.S. at 124, 94 S.Ct. 1694. This analysis is not a balancing of federal and state interests; rather the court must assess "the structure of the federal labor law to determine whether certain conduct was meant to be unregu-

lated." *Metro. Life*, 471 U.S. at 749 n. 27, 105 S.Ct. 2380 (citing *Brown v. Hotel & Rest. Employees & Bartenders Int'l Union Local 54*, 468 U.S. 491, 502–03, 104 S.Ct. 3179, 82 L.Ed.2d 373 (1984)). An appreciation of the State's interest in providing assistance, however, may inform any inference of Congressional intent and may help in shaping the boundaries of NLRA preemption. *Id.* (citing *N.Y. Tel.*, 440 U.S. at 539–40, 99 S.Ct. 1328); *accord Livadas*, 512 U.S. at 120, 114 S.Ct. 2068.

The defendants argue that it was the intent of Congress that the NLRA permit the defendants' actions in this case. In the context of the State's anticipatory subsidies, the court must address whether the directives reflected in the NLRA and Title XIX of the Social Security Act regulating the Medicaid program illustrate Congressional intent to permit the defendants' actions. In the context of the State's use of the National Guard and other state resources, the court must address whether the government's actions touch interests so deeply rooted in local feeling and responsibility that the court cannot infer that Congress intended to deprive States of the power to act as the defendants did.

a. *Anticipatory Subsidies: Medicaid and the NLRA.* Under Title XIX and Connecticut state law, the State is charged with protecting the health and welfare of its indigent elderly. *E.g.,* 42 U.S.C. § 1396a(a) ("A State plan for medical assistance must ... (19) provide such safeguards as may be necessary to assure that ... care and services will be provided, in a manner consistent with simplicity of administration and the best interests of the recipients."); 42 U.S.C. § 3001 ("[I]t is the joint and several duty and responsibility of the governments of the United States, of the several states and their political subdivisions ... to assist our older people to secure ... physical and mental health ... [and][f]ull restorative services for those

who require institutional care."). Accordingly, the State has an important interest in ensuring that an appropriate level and quality of care is maintained in nursing homes without regard to labor disputes.

The State's obligations, however, do not provide a wholesale justification for interference with District 1199's lawful labor activities. *NLRB v. N.Y.*, 436 F.Supp. 335, 338–39 (E.D.N.Y.1977); *N.Y. v. Local 144, Hotel, Nursing Home & Allied Health Services Union*, 410 F.Supp. 225, 228–29 (S.D.N.Y.1976); *see also Golden State I*, 475 U.S. 608, 618, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986) (holding that traditional government functions and spending decisions are subject to preemption in appropriate circumstances). Congress considered the impact on patients of allowing employees of nursing homes and other critical care facilities to strike and explicitly rejected efforts to insulate state laws, which had prohibited strikes by and lockouts of health-care workers, from preemption based on concerns about patient health and safety. *Id.*; S.Rep. No. 93–766 (1974), *reprinted in* 1974 U.S.C.C.A.N. 3946, 3953–58 (detailing Senator Dominick's opposition, including discussion of state laws in Minnesota and Pennsylvania that prohibited strikes and lockouts in the health-care field, and comments on the threats from strikes and slowdowns to the "public interest in having access, unimpeded and unhindered, to the best possible health care"). Thus, the defendants cannot rationalize their actions based solely on a general and undefined interest in protecting the health and welfare of nursing-home residents.

Instead, the court must determine whether the defendants' actions were taken to effectuate the purposes of the federal Medicaid program as contemplated by Congress. The defendants argue that the Medicaid program evidences Congress's intention not to preempt state action taken to satisfy a state's obligations under Medicaid, even if that action impacts labor activities. *See N.Y. Tel. Co. v. N.Y. State Dep't of Labor*, 440 U.S. 519, 536, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979) (plurality opinion) ("[T]he federal statute authorizing the subsidy provides additional evidence of Congress' reluctance to limit the States' authority in this area."). In support of this argument, the defendants rely heavily on the rationale of *New York Telephone* as applied to this case.

A plurality in New York Telephone held that Congress did not intend to preempt state unemployment compensation for striking laborers. *Id.* at 545–46, 99 S.Ct. 1328. The differences in the various opinions in New York Telephone focused on the burden in NLRA preemption cases and the appropriate application of various exceptions to *Machinists* preemption. *See id.* at 546, 99 S.Ct. 1328 (Brennan, J., concurring), 549–51 (Blackmun, J., concurring), 557–60 (Powell, J., dissenting). A majority of the justices, however, agreed that the plurality's analysis of Title IX of the Social Security Act, establishing the federal unemployment compensation scheme, and its legislative history demonstrated that Congress did not intend to preempt state unemployment compensation law. *See id.* at 540–46, 99 S.Ct. 1328 (plurality opinion), 547 (Brennan, J., concurring), 547 (Blackmun, J., concurring); *accord Metro. Life*, 471 U.S. at 750 n. 28, 105 S.Ct. 2380 (analyzing the opinions in New York Telephone ). Therefore, this court will examine the legislative history of Title XIX.[40]

---

**40.** The court notes that, in contrast to New York Telephone, the relevant legislative history in this case reveals that Congress never considered the circumstances at issue. The Supreme Court, however, did not rely on the strength of the legislative history in New York Telephone as the basis for using that legislative history to define the boundaries of pre-

When Congress enacted Title XIX of the Social Security Act in 1965, it established the participatory federal medical assistance scheme, known as Medicaid.[41] Title XIX authorizes the federal government to provide grants to states with programs approved by the Secretary of Health and Human Services. 42 U.S.C. §§ 1301(a)(6), 1396 *et seq.* Although the Secretary, through HCFA, must approve the state Medicaid Plans, Congress has recently granted the states wide latitude in structuring state Medicaid programs, especially in the field of rate-setting.[42] In light of

emption. Accordingly, despite the scant legislative history on the intersection of Medicaid and federal labor law at nursing homes, this court considers the analysis in New York Telephone applicable where a defendant raises federal law as a justification for actions that the NLRA would otherwise preempt, because the potential conflicts between federal laws shape the zone of *Machinists* preemption by providing more refined evidence of congressional purpose. *See Livadas v. Bradshaw,* 512 U.S. 107, 120, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994) ("If ... the [State's] policy were actually compelled by federal law ..., we could hardly say that it was, simultaneously, pre-empted; at the least, our task would then be one of harmonizing statutory law. But we entertain this and other justifications claimed [for non-preemption], not because constitutional analysis under the Supremacy Clause is an open-ended balancing act, simply weighing the federal interest against the intensity of the local feeling, but because claims of justification can sometimes help us to discern congressional purpose, the 'ultimate touchstone' of our inquiry." (citation omitted) (citing *N.Y. Tel.*, 440 U.S. at 533, 99 S.Ct. 1328 (plurality opinion))).

41. The court presumes that Congress was aware of the body of law developed under NLRA preemption when it enacted Title XIX. *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 696–98, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). Moreover, the court presumes that Congress was aware of the 1974 expansion of the NLRA to include health care workers, in light of continued amendments to Title XIX. *Compare, e.g.,* Balanced Budget Act of 1997, Pub.L. No. 105–33, § 4711, 111 Stat. 251, *with* Act of July 26, 1974, Pub.L. No. 93–360, 88 Stat. 395.

42. In 1997, Congress modified Title XIX in response to criticisms from States and other organizations that HCFA excessively micromanaged the state Medicaid programs. Balanced Budget Act of 1997, Pub.L. No. 105–33, § 4711, 111 Stat. 251; H.R.Rep. No. 105–149, at 574–75 (1997) ("Through a network of

regional offices, HCFA is supposed to work with State Medicaid departments to ensure appropriate management of Medicaid programs. Many states complain, however, that HCFA's role is less a matter of coordinated cooperation than an example of excess Federal micro-management."); *cf. Wilder v. Va. Hosp. Ass'n,* 496 U.S. 498, 515–16, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990) (detailing the legislative history of the statute before the 1997 reforms, which statute also reduced the federal oversight role of state Medicaid rate-setting compared to the preceding scheme); H.R.Rep. No. 104–651, at 8, 324–36 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2183, 2189, 2237–49 (proposing more substantial reforms of Medicaid than those changes enacted in 1997, in order to foster state innovation in handling medical care). As a small step to reform the perceived problems with the Medicaid program, Congress reduced the states' requirements for rate-setting to some form of state public process, replacing federal substantive and procedural requirements that were "the program's most restrictive barriers to innovation and quality." H.R.Rep. No. 105–149, at 575.

Moreover, courts have recognized the significant discretion Congress conferred on States to administer Medicaid programs. Courts have commented on state discretion not only in rate-setting, *N.Y. ex rel. Perales v. Sullivan*, 894 F.2d 20, 24 (2d Cir.1990) (noting that "the language of § 1396a(a)(13)(A) evinces Congress' plan to grant the states latitude in setting its Medicaid rates," but requiring a degree of federal oversight in light of statutory language before the 1997 Medicaid reforms); *cf. Wilder*, 496 U.S. at 519, 110 S.Ct. 2510 ("That the [pre-1997 statute] gives the States substantial discretion in choosing among reasonable methods of calculating rates may affect the standard under which a court reviews whether the rates comply with the [statute], but it does not render the [statute] unenforceable by a court."), but also in defining limitations on Medicaid coverage, *Alexander v. Choate*, 469 U.S. 287, 303, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) (recognizing

the broad discretion granted to the states with regard to Medicaid payments, the court concludes that Congress did not intend the NLRA to preempt actions taken pursuant to state Medicaid law, absent explicit prohibition. *See N.Y. Tel.*, 440 U.S. at 544, 99 S.Ct. 1328 (plurality opinion). There is no express prohibition of the defendants' actions in this case. Therefore, the court must determine whether the defendants' actions were taken pursuant to either the mandate of Title XIX or the discretion Congress conferred

on States to administer Medicaid programs.

■ The defendants rely on Connecticut General Statutes § 17b–340 to justify payments, beyond the publicly set rates, for extraordinary circumstances.[43] Conn. Gen.Stat. § 17b–340(a) ("The commissioner may, in his discretion, allow the inclusion of extraordinary and unanticipated costs of providing services which were incurred to avoid an immediate negative impact on the health and safety of patients."). The defendants need not establish that

substantial discretion conferred under Title XIX "to choose the proper mix of amount, scope, and duration limitations on coverage, as long as care and services are provided in the best interests of the recipients" (quoting 42 U.S.C. § 1396a(a)(19))), and in setting the level of medical assistance available, *Beal v. Doe*, 432 U.S. 438, 444–45, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977) (recognizing substantial discretion conferred under Title XIX for States to determine the extent of medical assistance available under Medicaid, so long as a State's standards are reasonable and consistent with the objectives of the Act) (citing 42 U.S.C. § 1396a(a)(17)).

**43.** The court notes that, although District 1199 seeks a declaratory judgment that the defendants' use of section 17b–340 to provide anticipatory subsidies constitutes unlawful interference, District 1199 has not challenged the defendants' interpretation of the statute as permitting the payments in a job action context. At hearings and in prior rulings, the court informed District 1199 that it considered the interpretation of the statute a novel and complex issue of state law. Accordingly, the court instructed the union that, if it disputed the defendants' interpretation, it should inform the court immediately so a question could be certified to the Connecticut Supreme Court. *E.g., New England Health Care, Employees Union, Dist. 1199 v. Rowland*, 204 F.Supp.2d 336, 348 n. 12 (D.Conn.2002); *New England Health Care, Employees Union, Dist. 1199 v. Rowland*, 170 F.Supp.2d 199, 218 n. 14 (D.Conn.2001). District 1199 has not informed the court that interpretation of the statute is an issue in this case. Accordingly, for purposes of this decision, the court accepts the defendants' interpretation of the

statute as permitting payments outside the daily rates in the case of a strike and does not address whether, for example, strikes are extraordinary and unanticipated events. *See, e.g.*, Tr. at 333–34. Instead, the court focuses on the State's application of the statute to the facts in this case. Furthermore, the court notes that the issue may be moot because preemption analysis does not turn on "whether the [State's] policy is, as a matter of state law, a proper interpretation of [section 17b–340] ... rather [it] turns on the actual content of [the] policy and its real effect on federal rights." *Livadas*, 512 U.S. at 119, 114 S.Ct. 2068.

In the same vein, the court notes that the plaintiff, although it presents proposed conclusions of law and has argued briefly in summary judgment pleadings on the subject, has not pled a cause of action for violation of the public process requirement of 42 U.S.C. § 1396a(a)(13). *See Wilder*, 496 U.S. at 509–10, 110 S.Ct. 2510 (holding that a separate cause of action under Section 1983 exists to enforce the former Medicaid rate-setting scheme, under the Boren Amendment). The plaintiff's complaint never touches, explicitly or implicitly, on the public process requirement, and the defendants have never responded substantively to the plaintiff's statements about public process. Therefore, the court does not consider the issue submitted for decision because no such claim was pled or pressed in this litigation. *See, e.g.*, Pretrial Conference Tr. [Dkt. No. 83], at 40 ("[T]he main thing we complain about is the replacement workers, who paid? Should the State have advanced the money, should the owners?").

their actions were authorized specifically by federal Medicaid statutes if the payments fall within the discretion Congress created for States to structure Medicaid programs. *See N.Y. Tel.,* 440 U.S. at 546, 99 S.Ct. 1328 (plurality opinion). As Justice Stevens wrote:

> [A] State's power to fashion its own policy ... is not to be denied on the basis of speculation about the unexpressed intent of Congress.... In an area in which Congress has decided to tolerate a substantial measure of diversity, the fact that the implementation of this general state policy affects the relative strength of the antagonists in a bargaining dispute is not a sufficient reason for concluding that Congress intended to pre-empt that exercise of state power.

*Id.* In this case, section 17b–340 is an effort, within the broad discretion conferred by Congress, to effectuate the purpose of the Medicaid program to protect the health and welfare of the nursing-home residents. Accordingly, the court concludes that Congress did not intend to preempt state Medicaid payments for strike-related expenses where such payments were necessary to avoid an immediate negative impact on the health and safety of the residents.

The court must thus determine whether the strikes in this case did create an immediate negative impact that necessitated the defendants' actions. *See* Conn.Gen.Stat. § 17b–340(a); 42 U.S.C. § 1396a(a)(19) (requiring a State to provide "safeguards as may be necessary to assure ... care and services ... consistent with ... the best interests of the recipients"). Whether the strikes created an immediate negative impact depends on the circumstances surrounding the job action. The State must consider the financial viability of the individual nursing home as well as the availability of resources. As examples, in determining whether action is required to avoid an immediate negative impact on the health and safety of residents, the State should weigh the number of strikes, striking workers, and affected residents; the anticipated length of the job action; and the location, capacity, and cost of available nursing pools.

In this determination, the court will consider whether the section 17b–340 payments at issue in this case were calculated to address the immediate negative impact on residents while respecting, to the extent consistent therewith, District 1199's labor rights. Even if the State could pay anticipatory subsidies, the court must determine whether Congress contemplated that the NLRA permit the manner and extent of the State's interference with federal labor rights through the policy as applied during the 2001 labor dispute. *Livadas,* 512 U.S. at 119, 114 S.Ct. 2068 ("Pre-emption analysis, rather, turns on the actual content of respondent's policy and its real effect on federal rights."); *see also United Steelworkers v. Johnson,* 830 F.2d 924, 928–29 (8th Cir.1987) (2–1 decision) (holding that South Dakota's "skewed application of its facially neutral test" for unemployment compensation violated the NLRA); *Mass. Nurses Ass'n v. Dukakis,* 726 F.2d 41, 45 (1st Cir.1984) ("We would ... add the caveat that any pretextual, arbitrary, or capricious invocation of [a statute] as an excuse ... would present quite a different case, subject to different principles."). Further, the plurality in *New York Telephone* suggested that state policies focused on regulating private conduct in labor-management relations may be outside the scope of *New York Telephone's* preemption analysis and more likely preempted. *See N.Y. Tel.,* 440 U.S. at 532, 99 S.Ct. 1328 (plurality opinion) ("Unlike *Morton* and *Machinists,* as well as the main body of labor preemption cases, the case before us today does not involve any attempt by the State to regulate or prohibit private con-

duct in the labor-management field.... [It is easier to infer congressional] intent to pre-empt laws directed specifically at concerted activity.").

As an initial matter, the court notes that District 1199 has challenged the anticipatory nature of the section 17b–340 subsidies. HCFA, however, recognizes a State's discretion to pay Medicaid providers before services are rendered. HCFA, Pub. No. 45, State Medicaid Manual § 2490, at 2–101. Accordingly, the defendants' payments are not preempted *solely* because they were paid in advance of the services.

However, the court concludes that not all of the anticipatory subsidies in this case were necessary to avoid an immediate negative impact on the health and safety of the residents. To explain this conclusion, the court must identify and analyze different stages in a job action where an immediate negative impact on health and safety may arise. For present purposes, the court recognizes two relevant stages.

First, when a strike begins and workers do not appear for their shift, a nursing home faces an immediate negative impact on resident health and safety due to the lack of workers to care for the residents. Accordingly, costs incurred to avoid that negative impact would be reimbursable, but would not necessarily qualify for an anticipatory subsidy because the negative impact does not occur until the strike begins. Even if costs are reimbursable at a later date, the State must justify the *timing* of its payment in accordance with the *immediacy* of the negative impact on resi-

dents. For example, under most circumstances, mere notice of a job action at *one* nursing home does not present such an immediate negative impact on resident safety that it would justify anticipatory subsidies.[44]

The second stage occurs before a strike, where a nursing home cannot prepare for a job action sufficiently to ensure that the residents will be protected in the event of a strike and that inability to prepare will lead inevitably to, for example, a lack of workers to care for residents. The immediacy arises where planned contingencies, necessary to maintain uninterrupted services for residents, require consideration before the strike begins.

A statewide job action, as occurred in this case, poses such concerns. Local nursing pools were insufficient in light of the large-scale strike. Because the struck nursing homes needed so many replacement workers to accommodate all the facilities, the employers were forced to turn to out-of-state replacements. Out-of-state replacement workers increase the financial burden on the nursing homes because the workers require travel expenses, lodging, and per diem subsistence fees, in addition to their substantial, guaranteed daily charges. Further, nursing homes could not wait for the strike to begin because U.S. Nursing required payment in advance. The financial inability of a nursing home to contract for replacement workers, by paying retainers and fees, in anticipation of a strike would pose an immediate

---

**44.** The court notes that it is not presented with a factual situation that involves mere notice at one nursing home. Although District 1199 only issued strike notices in December 2001 to Birmingham and no strikes occurred there, the parties have not requested that the court substantively consider that incident beyond its value as evidence of the State's policies and purposes. The trial record on the Birmingham situation is not as complete as the other job actions; for example, the record lacks details about extraordinary circumstances, such as the need for out-of-state replacement workers, census data, and the Medicaid population, that may justify anticipatory subsidies or extraordinary-cost reimbursements. Therefore, the court limits its discussion to the case as pled, without addressing the potential additional issue raised by the Birmingham strike notices.

negative impact on the residents' health because, absent such payments, replacement workers inevitably would not be available once the strike began. Anticipatory subsidies would be necessary to avoid the immediate negative impact to residents' health if a nursing home's financial instability made the nursing home unable to be prepared for a strike. ·

In this case, before the March job action, DPH verified, and the court has found, that a nursing home would have problems obtaining local replacement workers in the current job market. DSS, however, never did any assessment before the March job action of the financial ability of each struck nursing home to pay for out-of-state replacement workers. Rather, the State relied on generalizations about the financial status of the nursing-home industry. Generalizations cannot rationalize the extraordinary relief offered through anticipatory subsidies; the State must have an individualized basis for concluding that costs at a nursing home, in light of its financial condition, qualify it to receive payment under section 17b–340(a), if that statute is the justification for anticipatory subsidies.

The court does not suggest that the State need apply a specific methodology. Depending on the circumstances of the particular job action, constraints on the State may preclude a detailed analysis of a nursing home's finances. However, the State needs a minimally reliable process for determining that a nursing home could not avoid the threat to resident health and safety because it could not pay the Medic-

aid portion of its strike-related expenses without immediate relief from the State.[45]

The court cannot infer from the State's discretion under Medicaid that Congress intended that the State, relying on generalizations and "gut checks," be able to make blanket, uncapped, anticipatory subsidies that effectively neutralize the economic impact of a strike at nursing homes, such as iCare with its ninety-five percent Medicaid population, without satisfying some reasonable standard of eligibility for payments consistent with the objectives of Title XIX.[46] Section 17b–340(a) imposes a discretionary standard, but a standard nonetheless, that authorizes payments only for extraordinary costs to avoid an immediate risk to residents. The State's policy for anticipatory subsidies during the March job action did not satisfy that standard because the State did not have a basis for concluding that an immediate risk existed at each nursing home. If a nursing home had sufficient funds to pay retainer fees, costs, and wages for replacement workers, no immediate threat to the health and safety of nursing-home residents existed to justify an anticipatory subsidy. While the nursing home may be entitled eventually to reimbursement for those expenses under the State Medicaid Plan, nothing justifies payment before the facility incurs the expense. Accordingly, the court concludes that the State's March policy interfered with the plaintiff's rights to an extent not contemplated by Congress and thus, is preempted under the NLRA.

---

**45.** For example only, if the State had little time or insufficient resources, it could require that nursing homes submit a sworn financial statement that would be subject to later audit and separate penalties for false information.

**46.** The court notes that, even though it must assess whether the State's actions "conflict[ ] with or otherwise 'stand[ ] as an obstacle to

the accomplishment and execution of the full purposes and objectives' of the federal law," it does not intend to "pass judgment on the reasonableness of state policy." *Livadas v. Bradshaw*, 512 U.S. 107, 120, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994) (quoting *Brown v. Hotel & Rest. Employees & Bartenders Int'l Union Local 54*, 468 U.S. 491, 501, 104 S.Ct. 3179, 82 L.Ed.2d 373 (1984)).

During the May job action, the State did require that nursing homes submit financial information that justified anticipatory subsidies. While the financial data received by DSS provided a basis for subsidies under a post-hoc audit, the State did not allocate sufficient staff to complete the review of that information before making anticipatory subsidies. The court reiterates that nothing constrains the State to use a specific methodology. Therefore, a full audit may not be possible before authorizing anticipatory subsidies, but the State must conduct a review of financial documents that is sufficient to develop a reasonable basis for concluding that such payments are necessary to avoid an immediate threat to the health and safety of a nursing home's residents. For the same reasons noted with regard to the March policy, where the State provided anticipatory subsidies without substantive review of the financial data it had on a nursing home to determine that the home required the anticipatory subsidy to avoid an immediate threat to residents' health and safety, the May policy interfered with the plaintiff's rights to an extent not contemplated by Congress and is, thus, preempted under the NLRA.

The court has thus concluded that Congress expected the State to act in order to protect nursing-home residents where the State has a reasonable basis to find that an immediate threat to residents' health and safety exists. The court has further concluded that the State lacked a well-grounded basis to justify such payments to each home to which they were made. The court has recognized, however, that the State, in withholding anticipatory subsidies in May, undertook an individualized assessment before making those decisions.

■ Alternatively, and in addition, the court concludes that the State's policy during the 2001 labor dispute with regard to anticipatory subsidies exceeded the inter-ference with NLRA rights that Congress contemplated under Medicaid. The State's conduct, as evidence of its over-arching policy for anticipatory subsidies during the labor dispute, draws into question whether Congress countenanced Connecticut's actions to the degree that they interfered with NLRA rights. While the court concludes that Congress contemplated interference to protect residents, the manner and extent of the State's interference through its policy of paying anticipatory subsidies in 2001 surpasses the scope of the court's inference that Congress intended to permit a facially neutral anticipatory-subsidy policy to protect residents. The court cannot infer that Congress contemplated that the State may ignore federal labor rights because it has a strong interest to protect, especially where the State makes no effort to reasonably tailor its response to the interest it seeks to protect. Further, the court cannot infer that Congress countenanced interference with federal labor rights where one manifest purpose of the State's policy is to directly involve the State in the substantive aspects of the bargaining process, in contravention of the NLRA. Based on the State's failure to narrow its interference with federal labor rights and its demonstrated efforts to control the collective bargaining process, the court concludes that Congress did not contemplate that the manner and extent of interference from the State's policy of anticipatory subsidies, as applied during the 2001 labor dispute, would not be preempted by the NLRA.

First, the court cites, as examples of the State's failure to narrow its interference, the State's actions and lack thereof in preparation for, during, and subsequent to the 2001 labor dispute, which demonstrate that it reflexively resorted to anticipatory subsidies in response to nursing-home strikes without objectively exploring the necessity of the subsidies and all the other options available to the State in order to

ensure the health and safety of residents.[47] For example, DSS, which authorized the anticipatory subsidies, did not request or substantively consider the nursing homes' contingency plans, as prepared for DPH, even though DPH reviewed, verified, and approved the plans, concluding thereby that the welfare of the nursing home's residents was assured during the job action.[48] As the only example, DSS's failure in this regard would be insufficient for the court to conclude that the State exceeded the reasonable bounds of an exception to protect residents, because the contingency plans did not include any financial information that DSS could use to calculate a nursing home's need for anticipatory subsidies. However, the failure indicates a lack of communication with and indifference toward the agency charged with assessing concerns about resident health and safety, which diminishes DSS's professed concern that the full scope of its action was necessary to address an immediate threat to the health and safety of residents. Further, if the defendants' principal concern was nursing home residents' health and safety, the court would have expected communication by the State with District 1199 concerning the extraordinary steps the State planned.

Another circumstance that weakens the State's protestations of resident health and safety is the Birmingham situation. Confronted with a strike notice at only one facility, DSS instinctively assumed that anticipatory subsidies may be appropriate if Birmingham could not obtain local replacement workers and had any difficulty with cash flow to pay for out-of-state replacements. DSS did not explore options avail-

able to DPH, for example, to move residents, or options to curtail operations that nursing homes had used in the past. While those options could play no role in the March and May job actions because of the magnitude of the strikes and the number of nursing homes affected, the logistical concerns of numerous widespread strikes in those situations were not a factor at Birmingham. Further, DSS again did not review Birmingham's strike contingency plan or otherwise confer with DPH about available and appropriate methods to protect resident health and safety. The State's reliance on anticipatory subsidies at Birmingham without considering alternative means to protect the facility's residents further evidences the State's failure to tailor its anticipatory-subsidy policy in a manner and to an extent that Congress countenanced as reasonably necessary to address the safety of nursing-home residents.

Finally, as a specific example that undermines the scope of the State's policy and demonstrates the State's involvement in the bargaining process, the court points to the circumstances surrounding the strike at iCare. The State ceased anticipatory subsidies to iCare, not because it was the only remaining facility and alternatives to assure resident health and safety became available and not because the State determined that iCare no longer needed the financial assistance, but rather because the State became dissatisfied with iCare's bargaining position, referring to the employer as intransigent and suggesting that it was not bargaining in good faith. Even though iCare was the only remaining nursing home struck by District 1199, the State

---

47. The court notes that, despite recitations regarding the health and safety of nursing-home residents, state officials admitted the State's financial motivation underlying anticipatory subsidies, which motivation derived from strict adherence to the State's proposed

budget and policy of funding all nursing homes equally.

48. The contingency plan detailed the nursing home's efforts to ensure that it satisfied its obligations as the primary legal entity entrusted with the health and safety of its residents.

did not consider other alternatives that would protect the health and safety of iCare residents, such as the panoply of options available to DPH, before it decided to cease anticipatory payments, nor did it determine, when iCare became the only home struck, that other options were available to assure the health and safety of its residents and that thus anticipatory subsidies could be halted. At that point, the State knew that District 1199 had acquiesced to contracts within the rates set by the proposed budget and had offered to settle with iCare under similar terms. Further, state officials admitted that they knew that, by stopping the payments, they created a risk to the residents that the nursing home may not be financially capable of retaining the replacement workers. Nonetheless, state officials stopped the anticipatory subsidies without concern for the health and safety of iCare's residents because they had a "gut feeling" that iCare would settle quickly.

Under the circumstances, the court concludes that the State stopped the payments to iCare because, in Ryan's words, District 1199 "caved" to the State's budgetary restrictions and, thus, the State no longer had a financial interest in prolonging the job action. By balancing the health and safety of the residents against settling the District 1199 labor dispute within the range of the proposed budget, and in light of the other factors mentioned, the State had not narrowed its interference with federal labor rights to the manner and extent reasonably expected to accomplish the State's interest in protecting resident health and safety. Further, the iCare situation demonstrates that one of the State's primary objectives for its anticipatory-subsidy policy during the 2001 labor dispute was direct involvement in the substantive aspects of the bargaining pro-

cess to ensure settlements that conformed to the State's budgetary policies.

Congress did not intend that the State should be permitted to interfere in collective bargaining as it did through the anticipatory-subsidy policy; the State acted outside the scope of the exception under Title XIX for discretion to administer Medicaid. The State invoked its anticipatory-subsidy policy when it would accomplish the State's financial objectives, not when the State knew that a threat to the health and safety of nursing-home residents existed. Because the State's policy interfered with the plaintiff's rights under the NLRA to an extent not contemplated by Congress, the State's actions were preempted.

The court does not suggest that the State could not pursue its financial policies. For example, it is possible that the State could have refused to fund collective bargaining agreements beyond the proposed 2½ % increase. However, the State could not exceed mere enforcement of its desired terms and involve itself in the substantive aspects of the bargaining process. By favoring one party to a labor-management dispute and thereby curtailing another party's protected use of an economic weapon in order to manipulate the bargaining process, the State engages in conduct that Congress did not contemplate as an acceptable method to impose state budgetary policies.

b. *National Guard and State Resources: Local Interests.* The court next turns to the State's use of the National Guard and other state resources during the 2001 labor dispute. The defendants argue that their actions "touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, [the court] could not infer that Congress had deprived the States of the power to act."[49] *San*

**49.** The plaintiff argues that the local interest

exception developed under *Garmon* preemp-

*Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236, 244, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959); *accord Delta Air Lines, Inc. v. Kramarsky*, 650 F.2d 1287, 1299 (2d Cir. 1981).

As an initial matter, the court notes that the defendants' local interest position does not present any new arguments with regard to the Medicaid payments previously discussed. A local interest in public safety is not as broad an exemption from NLRA preemption as state discretion to administer Medicaid programs. As described, *infra*, the local interest exception in public safety would extend no further than actions taken to avoid actual or imminent safety concerns. Similarly, the State's discretion under Medicaid extends to actions taken to avoid immediate threats to nursing-home residents' health and safety. For present purposes, any difference is insignificant. Further, with regard to the Medicaid payments, the defendants have no interest, deeply rooted in local feeling and responsibility, to provide anticipatory subsidies to financially stable nursing homes, to ensure that union contracts conform to state budget proposals, or to enforce indirectly a state policy of funding union and non-union nursing homes equally.

Accordingly, the court focuses on the remaining category of conduct challenged by District 1199, the defendants' involvement of the National Guard and use of state resources. The court acknowledges

that "[g]iven the vulnerable state of the residents of the nursing homes should there be a cessation of services by those who are charged with their care, ... NLRA supremacy over the economic rights of the unionized employees does not strip the State of its residual powers to protect the lives and health of those residents." *NLRB v. State of N.Y.*, 436 F.Supp. 335, 339 (E.D.N.Y.1977). Thus, "[w]hile the State may not prohibit the employees from going out on strike, ... when it appears that the lives and health of nursing home residents are threatened, the State remains free, in the exercise of its local responsibility, to take whatever reasonable steps are necessary to protect the residents from the effects of strike activity." *Id.* As the Supreme Court noted, despite the strength of the doctrine of federal preemption in labor law, "nothing [the Supreme Court has] said even remotely affects ... the right or duty of the chief executive or legislature of a State to deal with emergency conditions of public danger, violence, or disaster under appropriate provisions of the State's organic or statutory law." *Div. 1287, Street Employees v. Missouri*, 374 U.S. 74, 83, 83 S.Ct. 1657, 10 L.Ed.2d 763 (1963) (recognizing state authority in *emergency* conditions, but rejecting state efforts in "the public interest, health and welfare" to prevent interruption of public transit).

▮ Thus, in situations of, or that would inevitably lead to, actual or imminent violence or destruction of property,

---

tion jurisprudence does not exist in cases involving *Machinists* preemption. The court notes that the opinions in *New York Telephone* discussed the local interest exception with little reservation as applied to *Machinists* preemption, showing more concern about proper application of the exception rather than whether it applied. *See N.Y. Tel. Co. v. N.Y. State Dep't of Labor*, 440 U.S. 519, 539–40, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979) (plurality opinion); 546 note (Brennan, J., concurring);

550–51 (Blackmun, J., concurring); 559–60 (Powell, J., dissenting). Further, in *Metropolitan Life Insurance Co. v. Massachusetts*, 471 U.S. 724, 758, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985), the Court applied a local police power exception to *Machinists* preemption that either mimicked the local interest exception under *Garmon* or implicitly extended that exception to *Machinists* cases. Therefore, the court rejects the plaintiff's argument.

threats of violence, or danger to public health or safety, a State may regulate labor activity to the extent necessary to address the emergency. *Machinists,* 427 U.S. 132, 136 n. 2, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976); *Garmon,* 359 U.S. at 247–48, 79 S.Ct. 773 (citing *Youngdahl v. Rainfair,* 355 U.S. 131, 78 S.Ct. 206, 2 L.Ed.2d 151 (1957); *United Auto., Aircraft & Agric. Implement Workers v. Wis. Employment Relations,* 351 U.S. 266, 76 S.Ct. 794, 100 L.Ed. 1162 (1956)). "State jurisdiction has prevailed in these situations because the compelling state interest, in the scheme of our federalism, in the maintenance of domestic peace is not overridden in the absence of clearly expressed congressional direction." *Garmon,* 359 U.S. at 247, 79 S.Ct. 773.

(1) *National Guard Medical Personnel.* Addressing first the State's use of National Guard medical personnel, the court notes that the defendants applied a deliberate and thorough approach to deployment of Guard personnel to nursing homes. In light of the scattered statewide impact of the 2001 labor dispute, the National Guard were placed on standby as emergency response units. Before sending medical personnel, the State, employing a sophisticated communication network, waited for DPH to conclude that an imminent threat to resident health and safety existed due to the failure of replacement workers to arrive and the inability of the nursing home to address the resultant shortage of qualified personnel. OEM explored additional alternatives by contacting the replacement-worker contractor to inquire whether other workers were available. Only then did the State deploy the National Guard, as a last resort.

As further evidence that the role of Guard medical personnel was limited to truly emergency situations, the State only sent out personnel on a few occasions during the May strike and did not deploy any medical units during the March job action. Also, the court notes that the National Guard had no role during the Birmingham situation, reflecting the difference in the State's use of the National Guard when confronted with only one strike as opposed to multiple struck nursing homes spread throughout the State. The State's deliberate role for the National Guard contrasts with the uniform use of anticipatory subsidies in furtherance of the State's financial policies.

The State acted squarely within its jurisdiction to police conduct that threatens the public welfare when it placed the National Guard on standby for the duration of the statewide 2001 job actions and deployed personnel only in response to imminent danger to the health of nursing-home residents. The court cannot infer that Congress intended to preempt the State's police power to utilize the National Guard medical personnel in such a way during the 2001 labor dispute. Therefore, those actions are not preempted.

The court therefore concludes that in 2001 when the defendants mobilized medical units of the Connecticut National Guard, kept such Guard personnel on standby, and deployed medical personnel only as necessary to maintain staffing at struck nursing homes in the rare instance where all other contingency plans failed and an imminent threat to the health and safety of nursing-home residents existed, they were acting in a manner contemplated by Congress for states to act pursuant to interests so deeply rooted in local feeling and responsibility as protecting citizens from imminent health risks and thus were not preempted under the NLRA.

(2) *DOT Vans and Transportation Services.* Addressing next the use of DOT vans and National Guard drivers to transport hundreds of replacement and non-striking workers, the court notes that the State presented a less plenary explana-

tion of the state interest in providing these resources. The State presented some testimony, through Lieutenant Colonel Barry of the State Police, that sought to establish concerns about violence and destruction of property during prior job actions by District 1199. Similarly, state officials expressed the belief that destruction of property and criminal mischief were inherent in labor disputes, such that it necessitated efforts to minimize opportunities for misconduct in order to maintain law enforcement because the struck nursing homes were located throughout the State. The record also references concerns expressed by individuals crossing the picket lines.

First, with regard to the statements of Colonel Barry and other state officials, the court does not credit any testimony about violence, destruction of property, or criminal misconduct attributed to District 1199, or strikes in the abstract, in order to justify the State's actions.[50] Specifically, with regard to Colonel Barry, the court notes that he provided only conclusory worries about District 1199 members. As with many of the "gut" reactions in this case, Colonel Barry did not support his vague generalizations about District 1199 with concrete incidents or other objective evidence of prior misconduct. In contrast, District 1199 communicated openly with Colonel Barry, provided assurances that

its activities would be peaceful, and cooperated in coordinating picketing and arrests. In light of the working relationship and history between Colonel Barry and Brown over eight years and Brown's assurances in 2001, Colonel Barry had no reason to conclude that District 1199 members posed a threat of violence, destruction of property, or criminal misconduct that necessitated the steps taken in this case.

Next, with regard to concerns expressed by individuals crossing the picket lines, such concerns alone would not justify the State's actions taken purportedly to protect the peace. Neither the State nor the court has a basis to conclude that those concerns were well-grounded, or were anything more than subjective anxiety about unions or picketing in general. In response to concerns of non-employees, District 1199 readily provided state officials strike passes, which were distributed to state monitors, nursing-home clients, and other individuals unrelated to the labor dispute. Further, if employees had concerns, the nursing homes had the primary responsibility, generally and as part of their contract with U.S. Nursing, for transporting the replacement workers from their arranged lodging to the facilities and the option to contract with U.S. Nursing for security planning and services.[51] Finally, as part of the nursing

---

50. The court notes that alleged incidents of sabotage during the 2001 strikes cannot provide a post-hoc justification for the State's actions because the State must have a proper basis for its conduct before it acts. Further, the alleged incidents have little value to this case because there is insufficient evidence to establish that the problems were unusual in the course of nursing-home care and that, if they were unusual, members of District 1199 were responsible. Furthermore, the incidents of sabotage elicited in testimony—for example, glue in locks and removal of patient identification bracelets—are not of a nature that would justify the State's actions in transporting replacement and non-striking workers. While the alleged sabotage poses very serious

concerns, it does not justify an inference of violence toward workers outside the nursing homes, which inference could explain the State providing transportation services.

51. The court notes that, to the extent nursing homes have incurred or will incur transportation and security costs as part of their strike-related expenses, nothing in this opinion precludes the State from reimbursing those costs, if appropriate under the intersection of the NLRA with Title XIX and section 17b–340(a) described earlier. *See supra* Part II.B.3.a. If replacement workers demand group vans, staging areas, and driver service from nursing homes as part of their contract, the State could reimburse or subsidize those costs as

homes' contingency plans and their obligation to the residents, DPH required disclosure of adequate transportation strategies for workers and supplies and security arrangements.

The court concludes that the State had no evidence that District 1199 posed a real danger of violence or destruction of property during the 2001 labor dispute that related to the transportation of replacement workers. As a result, the State had no reasonable basis to conclude that the transportation arrangements were necessary to provide order and peace, so its actions in that regard fall outside the ambit of the local interest exception. By providing those tangible resources and services, the State removed significant expenses for security and transportation that were the nursing homes' responsibility and thereby minimized the economic impact of District 1199's strike. Thus, the defendants' conduct in providing transportation services interfered with the plaintiff's rights and is preempted under the NLRA.

The court declares that, in 2001, the defendants impermissibly rented vans and used State resources in order to transport replacement workers and non-striking nursing-home employees across legal, peaceful union picket lines, thereby impermissibly intruding on a private-sector labor dispute, to the detriment of District 1199.

(3) *Qualified Immunity.* Because the transportation aspect of the preemption claim persists against the Governor in his individual capacity, the court must determine whether he is entitled to qualified immunity.[52] Qualified immunity applies where "(a) the defendant's actions did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Salim v. Proulx,* 93 F.3d 86, 89 (2d Cir.1996).

The court concludes that Governor Rowland, in his individual capacity, is entitled to qualified immunity for this aspect of the preemption claim. Although the court does not credit the testimony of the state officials with regard to the dangers posed by District 1199, an objectively reasonable person in Governor Rowland's position could reasonably have believed the warnings of Colonel Barry and others and concluded that the transportation services were a response warranted by the danger of imminent violence or destruction of property. The Governor consults top officials in his administration because he trusts their advice. Further, the Governor relied on the information he received from state officials regarding the 2001 labor dispute and allegations of violence and destruction of property by District 1199 in prior job actions. As a result, under most circumstances, he has no reason to ques-

---

strike-related expenses if the costs otherwise satisfied the previously articulated standard, regardless of whether any actual threat justified the replacement workers' demands. The court's current analysis is limited here to whether the record justifies the State's use of vans and transportation services based on public safety concerns.

52. There were three aspects of Governor Rowland's qualified immunity defense with regard to the plaintiff's preemption claim: (1) Medicaid payments; (2) use of National Guard; and (3) transportation services. In its

Summary Judgment Ruling [Dkt. No. 72], at 39–40, the court granted qualified immunity on the preemption claim with regard to the Medicaid payments. Although the court found that material issues of fact precluded qualified immunity on the National Guard issues, the court's conclusion in this Decision that the State's actions in that regard were not preempted moots any argument for qualified immunity. *See supra* Part II.B.3.b(1). Accordingly, the only remaining portion of the preemption claim with a pending qualified immunity defense regards the transportation services.

tion the factual allegations conveyed to him by Colonel Barry and other state officials. If Governor Rowland believed Colonel Barry, he could reasonably conclude that District 1199 posed a danger that justified the vans and transportation services provided to replacement and nonstriking workers. In other words, it was objectively reasonable for Governor Rowland to believe that his actions did not violate the law; thus, he is entitled to qualified immunity in his individual capacity.

### C. First Amendment

■ To establish a claim of retaliation for the exercise of First Amendment rights, District 1199 must prove that "(i) [it] has an interest protected by the First Amendment, (ii) the defendant['s] actions were motivated by or substantially caused by the plaintiff's exercise of that right and (iii) the defendant['s] actions chilled the exercise of those rights." *Kerman v. City of New York*, 261 F.3d 229, 241–42 (2d Cir.2001). The plaintiff has not satisfied the second element if the Governor would have taken the same actions regardless of any motivation to retaliate. *See Vega v. Miller*, 273 F.3d 460, 469 (2d Cir.2001); *Kerman*, 261 F.3d at 242; *Morris v. Lindau*, 196 F.3d 102, (2d Cir.1999) ("The causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the [defendant's] action, that is to say, the [defendant's] action would not have been taken absent the [plaintiff's] protected speech.").

■ Under the third element, District 1199 must prove that Governor Rowland's actions, not solely his speech, "actually chilled" the plaintiff's speech. *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir.2001); *see X–Men Sec., Inc. v. Pataki*, 196 F.3d 56, 68–69 (2d Cir.1999). Accordingly, the plaintiff must allege "specific

present objective harm or a threat of specific future harm." *Curley*, 268 F.3d at 73 (quoting *Laird v. Tatum*, 408 U.S. 1, 13–14, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972)). If the plaintiff continues to engage in the protected speech that allegedly motivated unconstitutional retaliation, then it failed to establish an actual chilling of its speech. *Id.* (denying claim because plaintiff continued to run for mayor every year); *Singer v. Fulton County Sheriff*, 63 F.3d 110, 120 (2d Cir.1995) (continued to print newspaper criticizing village government); *Spear v. Town of W. Hartford*, 954 F.2d 63, 67 (2d Cir.1992) (continued to write critical editorials of town police department).

■ The court concludes that District 1199 engaged in protected activity, such as its picketing, strikes, lobbying, and public criticism of Governor Rowland and other public commentary. Nonetheless, while the long history of political differences between Governor Rowland and District 1199 suggests some basis for retaliation, the court concludes that the Governor would have taken the same actions, regardless of whether he had any retaliatory animus toward the union plaintiff. The record is clear that Governor Rowland had two driving motivations for his actions during the 2001 labor dispute: maintaining the integrity of his budget proposal, including his policy of funding union and non-union nursing homes equally, and protecting the nursing-home residents. In a remote sense, District 1199's strike caused Governor Rowland's actions because, absent the union's strikes, the Governor would not have approved anticipatory subsidies, use of the National Guard, and transportation services in order to protect his budget proposal and the nursing-home residents. The motivation and substantial cause for the Governor's actions, however, was the impact of District 1199's protected activity, potentially threatening the proposed bud-

get and health and safety of residents, not the protected activity itself. Because retaliation for District 1199's protected activity was not a motivating factor or substantial cause of the Governor's actions, the plaintiff has not satisfied the second element of its claim.

Moreover, District 1199 was not chilled by Governor Rowland's conduct. The union conducted all of its normal strike activities and included additional events that focused on the Governor, despite learning about the State's strike contingencies. Although District 1199 called off job actions in May and December in part because of the State's anticipatory subsidies and other strike preparations, the concern that "chilled" the union's activities in those instances was the nursing homes' threat to hire permanent replacements. The Governor's conduct affected District 1199's activity, but it did not chill that activity because the union proceeded with its job action knowing how the State would respond. *See Curley,* 268 F.3d at 73 ("Although plaintiff insists that his 1995 campaign was affected by his arrest—namely, that it was demoralized and only amounted to a token effort—the fact remains that Curley chose to run for public office even after the events of August 1994."). The court concludes that Governor Rowland did not violate the plaintiff's First Amendment rights.

## III. CONCLUSION

For the foregoing reasons, the court finds for the plaintiff on its claims for declaratory judgment with regard to the State's anticipatory Medicaid subsidy policies and the use of state resources to transport replacement and non-striking workers, during the 2001 labor dispute. The court finds for the defendants on the remaining claims and for Governor Rowland, in his individual capacity, on all claims.

Accordingly, the court declares:

(1) that in March 2001, the defendants provided anticipatory subsidies without a basis to conclude that the payments were necessary to avoid an immediate negative impact on the health and safety of nursing-home residents, which subsidies were thus not made within the State's discretion to administer Medicaid, and that the defendants, to the detriment of District 1199 and its members, thereby interfered with collective bargaining and the plaintiff's right to strike in a manner, and to an extent, beyond that contemplated by Congress;

(2) that in May 2001, the defendants provided anticipatory subsidies without a basis to conclude that the payments were necessary to avoid an immediate negative impact on the health and safety of the nursing-home residents, which subsidies were thus not made within the State's discretion to administer Medicaid, and that the defendants, where they acted without sufficient basis to make the payments, thereby interfered with collective bargaining and the plaintiff's right to strike in a manner, and to an extent, beyond that contemplated by Congress;

(3) that during the 2001 labor dispute, the defendants provided anticipatory subsidies, under the pretext of Medicaid payments, in order to regulate the labor-management relationship between District 1199 and the struck nursing homes in accordance with the State's financial policies, and that the defendants thereby interfered with collective bargaining and the plaintiff's right to strike in a manner, and to an extent, beyond that contemplated by Congress when it con-

ferred discretion on states to administer Medicaid,

and:

that, in 2001, the defendants impermissibly rented vans and used State resources in order to transport replacement workers and non-striking nursing-home employees across legal, peaceful union picket lines, thereby impermissibly intruding on a private-sector labor dispute, to the detriment of District 1199.

As a final comment, the court stresses the highly fact-specific nature of its findings and conclusions. The Connecticut nursing-home industry, scope of the strike, nature of Medicaid reimbursement, availability of local nursing pools, and time for preparation, as some examples, created a landscape that framed the boundaries of the State's response. Changes in any number of circumstances could redefine the appropriateness of the State's conduct. Therefore, the court cautions that future job actions must be approached on a case-by-case basis, with proper respect for the situation as a whole, but also with a reliable assessment of the situation of each nursing home, individually. The State must take care that, in its zeal to act, it does not do so unnecessarily and outside the permissible bounds of its discretion and thereby tread on the federally protected zone of labor rights.

**SO ORDERED.**